WALTER A. HENSHAW ET AL V. TEXAS NATURAL
RESOURCES FOUNDATION ET AL.

No. A-1840. Decided January 5, 1949.
Rehearing overruled February 2, 1949.
(216 S. W., 2d Series, 566.)

*Neel, King & Rachal,* of Corpus Christi, and *Kelso, Locke & King,* and *J. R. Locke,* of San Antonio, for petitioners. ·

The Court of Civil Appeals erred in sustaining the action of the trial court in adjudicating a forfeiture of petitioner's legal title to a one-half undivided interest in the leases involved in this suit and of the proceeds of the production therefrom for failure to perform certain promissory obligations of a contract, where neither the instrument vesting such interest in the petitioners nor the contract defining such obligations contained any provision for the forfeiture of petitioners title for failure to perform such obligations. Johnson v. Johnson, 272 S. W. 225; Robinson v. Faville 213 S. W. 316; Chicago, T. & M. C. Ry. Co. v. Titterington, 84 Texas 218, 19 S. W. 472.

*Davenport & Ransome* and *Harbert Davenport,* of Brownsville, for respondents.

Where there is no time fixed for the performance of a contract, the law will interpolate an intention to agree upon a reasonable time, depending of course, upon the facts and circumstances of the particular case. Hart v. Bullion, 48 Texas 278; Self v. King, 28 Texas 552; Bush v. Merrill, 206 S. W. 835.

MR. JUSTICE SHARP delivered the opinion of the Court.

Texas Natural Resources Foundation and others brought this action against Henshaw Brothers and Monday Oil Company ·(which claims under Henshaw Brothers) to recover the oil and gas leasehold estate in 356.35 acres of land located in Jim Wells County. This land consists of a 178-acre tract, referred to as the "Grossman," and a 178.35-acre tract, referred to as the "Boerner." Southern Minerals Corporation had in its possession, as stateholder, certain monies claimed by the parties, and hence was joined as a party defendant. The trial was to the court without a jury, and judgment was for the plaintiff, the court making a disposition of the money in the hands of the stakeholder and awarding it attorney's fees. This judgment was affirmed by the Court of Civil Appeals .212 S. W. (2d) 241.

The suit arises out of a joint venture agreement between Walter A. Henshaw and Paul A. Henshaw on the one side and Code Oil Company, predecessor in title to respondents, on the other. There are involved a number of very lengthly and detailed contracts and agreements between the parties, and these will be set out in chronological order along with the events leading up to this litigation. The facts are undisputed.

On August 15, 1940, the leases in question were assigned to petitioners and delivered in escrow by certain officers of the Code Oil Company, acting in their individual capacity. The assignments are absolute in form. However, they were made subject to an escrow agreement executed between the parties at the same time. This escrow agreement provided that the leases were not to be delivered from escrow until certain drilling obligations were fulfilled by Henshaw Brothers; and it was provided that when the drilling operations resulted in a commercial producer, the assignors were to be paid $25.00 per acre.

On August 28, 1940, Henshaw Brothers and Code Oil Company entered into a written contract, which they designated as a "joint venture agreement." Under this agreement, which is too long and involved to be set out in full, Henshaw Brothers, who were designated therein as "Operators," and Code Oil Company, designated as "Company," both assumed certain obligations. Under the heading "Operators' Contributions," on the first page of the contract, appears the following paragraph:

"Operators have the right to acquire two certain assignments of oil, gas and mining leases (covering the Grossman and Boerner tracts) under an escrow agreement between C. G. Malott, Trustee, and J. Luther Knies, Trustee, as Parties of the Firt Part, and themselves as Parties of the Second Part, dated August 15, 1940, a copy of which agreement is attached hereto, marked Exhibit 'A', and incorporated herein by reference, and in the event those assignments are delivered to operators from escrow under the provisions of the escrow agreement, they shall be owned, held and handled pursuant to this agreement. Operators further agree that they will, at their sole cost and expense, drill the well hereinafter designated as 'First Operation,' and in the event of and upon completion of the well provided for in such 'First Operation' as a commercial oil and/or gas well, Operators agree to assume, discharge and perform the operations hereinafter designated as 'Second Operation" and 'Third Operation.' "

By the contractual provisions relating to the "First Oper-

ation," Henshaw Brothers agreed to begin drilling within thirty days upon a designated location, to a depth which was also designated, or until oil and gas in paying quantities was encountered and produced.

The contract provided three alternatives upon the completion of the well or cessation of drilling:

First. In the event the well should prove to be a dry hole, the operators were to be paid out of money which was deposited with the escrow agent by the Company, at the rate of $1.60 per lineal foot, and the contract would be considered as fully performed and "the venture terminated."

Second. In the event the well should be completed as a commercial producer, the funds deposited in escrow by the company were to be used to pay, in accordance with the escrow agreement, $25.00 per acre to the officers of the Company who had placed the leases in escrow after assigning them. It is provided that the operators were then to assign an undivided one-half of their interest in the leases to the Company, and were to expend the sum of $70,000.00 in drilling operations for the benefit of the joint venture, this to include the cost of drilling the well provided in the "First Operation."

Third. In a subsequent section of the joint venture agreement, entitled "General Provisions," it is provided that, after reaching the contract depth in the well designated as the "First Operation," if the operators did not desire to set casing, they could treat the well as a dry hole and receive payment from escrow as in the first alternative. However, it is also provided that the Company might take over the well and set casing, using the equipment of the operators, in which event the operators would have no interest in the well or the leasehold estates.

It was further provided in the contract that in the event the "First Operation" should prove to be a commercial producer, Henshaw Brothers would drill a second well upon the leases premises, said well being designated as "Second Operation." The "Third Operation" was the drilling of a third well upon the premises. However, it was provided that Henshaw Brothers, in lieu of drilling the second and third wells, could pay over to the Company one-half of $70,000.00, less the cost of drilling any wells they might have drilled.

In accordance with the contract, Henshaw Brothers entered upon the leased premises and drilled upon the Grossman Lease

the well which is referred to as "Grossman No. One." The producing sand encountered was only two and one-half to three feet in thickness, and the well would not have been one which could have been financed by the operators; so they elected to act under the third alternative above, and treat the well as a dry hole. However, the Company elected to set the casing itself, under its option set out in the contract.

On October 1, 1940, instead of considering the venture at an end as provided by the contract, the Code Oil Company and Henshaw Brothers entered into a supplemental agreement. This contract provided that the Company was to pay all the costs of drilling and completion of the Grossman No. One well; and should this prove to be a commercial producer, the Company would secure the leases from escrow. However, this well was not to be considered as the "First Operation" under the joint venture agreement. The contract provided that "all operations as provided for under the said original contract of August 28, 1940, shall be deferred until such time as the said parties may hereafter agree,' and pending such time the well being completed was to be operated by Henshaw Brothers under a separate agreement. This separate agreement provided that Henshaw Brothers would charge all expenses against a joint account, all materials and labor being billed at cost.

The supplemental agreement of October 1, 1940, also provided that the Company was to receive all the proceeds from the production of the Grossman No. One well until it received the sum of $35,000.00. This figure represents the actual cost of drilling and completion of the well, plus twenty per cent. interest for eighteen months. The agreement further provided that, in event another well was drilled on the leased premises, not offsetting a well off the premises, unless such well was completed as a "bankable well under the financing requirements of operators," Code Oil Company would pay all costs and be entitled to receive all proceeds until it received an additional $23,000.00; this figure also being the estimated actual cost plus twenty per cent. interest for eighteen months.

In connection with the foregoing supplemental agreement another agreement was executed on the same date, which provided that if the payout of the Grossman No. One well exceeded eighteen months, Code Oil Company would receive thereafter an additional amount equal to twenty per cent. per annum of $27,000.00, until it was paid in full.

The Grossman No. One well was completed as a commercial producer after the Code Oil Company took over and set the casing. The two assignments covering the Grossman lease and the Boerner lease were paid for out of the escrow deposit in the bank, and the assignments, which were absolute conveyances of those parts of the leases covered by the joint venture contract, subject to oil payments reserved therein, were delivered to Code Oil Company an undivided one-half interest in the portions of the leases transferred to them.

On October 16, 1940, Henshaw Brothers and Code Oil Company entered into a written agreement providing for the drilling of the "Boerner No. One" well. This agreement sets out that if the financing of Boerner No. One and Grossman No. One be handled by Henshaw Brothers, then these wells would be considered the First and Second Operations under the original joint venture agreement. The Borner No. One well was completed as a gas well, and Henshaw Brothers did not exercise their option to financing the drilling of the two wells. Thus the joint account was left with a charge of $58,000.00 against it, with interest at twenty per cent. on $27,000.00 after eighteen months.

Under an agreement entered into in January, 1941, the Code Oil Company and Henshaw Brothers drilled a dry hole on land not covered by the leases here involved but in the vicinity thereof. Both parties paid their respective parts of the cost of this well, which would have come under the joint venture agreement had it been a producer.

Division orders were executed to Southern Minerals Corporation for the sale of oil from the Grossman No. One well, after it was completed. In these division orders the parties certified that the working interest in the lease was owned one-half by Henshaw Brothers and one-half by Code Oil Company. Similar division orders were executed on the Boerner lease, which also certified that the working interest was owned in the same manner.

On October 1, 1941, at the request of the Texas Natural Resources Foundation, which had succeeded to the rights of the Code Oil Company, Henshaw Brothers joined with the Foundation in directing Southern Minerals Corporation to forward all proceeds from the leases to the Boatmen's National Bank of St. Louis, Missouri. Under this agreement $300.00 was to be kept by the bank in a revolving fund, to be used by Henshaw

Brothers for monthly operating expenses, and all the balance of the proceeds was to go to the Foundation to pay off the charges owed to it from the joint account. In the letter setting out the terms of this agreement, which was written to Henshaw Brothers by the Foundation, the leased premises were referred to as "those portions of the Grossman and Boerner Leases in Jim Wells County, Texas, owned and operated by the two of us under joint operating agreement." It was further provided that the Foundation would join Henshaw Brothers in terminating the authorization to Southern Minerals Corporation for it to forward all proceeds to the Boatmen's National Bank, "at any time at your request after the charge in favor of this Foundation as successor to Code Oil Company against the joint account shall have been discharged."

No further drilling was done on the premises, and it appears from the audit introduced in evidence that the Foundation received the balance of the full amount of its charges in May, 1945. On March 14, 1946, Henshaw Brothers wrote to Southern Minerals Corporation requesting it to hold in suspense the payments for the oil and gas from the wells in question. After a failure of negotiations between the parties, this suit was filed on October 14, 1946.

The controlling question presented here is whether the trial court and the Court of Civil Appeals, under all the facts and circumstances surrounding the execution of the contracts, and their interpretation by the parties themselves in operating thereunder, erred in holding that the Henshaws forfeited their rights under the terms of the contracts.

■ If there is any doubt about the meaning of the various terms of the contracts before us, the Court may consider the interpretation placed upon them by the parties themselves. In this instance acts of the parties indicated the construction mutually placed upon the contracts at the time, including the acts done in their performance, and same are entitled to great if not controlling weight. The practical construction placed upon a contract by the parties themselves constitutes the highest evidence of the intention of the parties that whatever was done by them in the performance of the contract was done under the terms of the contract as they understood them, and as under the terms of the contract it was intended should be done. Lone Star Gas Co. v. X-ray Gas Co., 139 Texas 546, 164 S. W. (2d) 504; Galveston, H. & S. A. R. Co. v. Johnson, 74 Texas 256, 11 S. W. 1113; E. H. Perry & Co. v. Langbehn, 113 Texas 72, 252 S. W.

472; San Antonio St. Ry. Co. v. Adams, 87 Texas 125, 26 S. W. 1040; Rio Bravo Oil Co. v. Weed, 121 Texas 427, 50 S. W. (2d) 1080, 85 A. L. R. 391; Neblett v. Armstrong, Tex. Com. App., 26 S. W. (2d) 166, 75 A. L. R. 577; Cooley v. Buie, Tex. Com. App., 291 S. W. 876; 10 Tex. Jur., p. 298, sec. 171; 17 C. J. S., Contracts, p. 755, sec. 325; 12 Amer. Jur., p. 787, sec. 249.

■ Since forfeitures are not favored, courts are inclined to construe the provisions in a contract as covenants rather than as conditions. If the terms of a contract are fairly susceptible of an interpretation which will prevent a forfeiture, they will be so construed. Knight et al v. Chicago Corp. et al, 144 Texas 98, 188 S. W. (2d) 564; Decker v. Kerlicks, 110 Texas 90, 216 S. W. 385; Bouldin v. Gulf Production Co., Tex. Civ. App., 5 S. W. (2d) 1019, writ dismissed; 12 Tex. Jur., p. 129, sec. 85. This is particularly true where the parties themselves have construed such a contract. Lone Star Gas Co. v. X-ray Gas Co., supra; 19 Tex. Jur., p. 803, sec. 7.

■ Unless the consideration in a contract is expressed in terms which unmistakably will demand a forfeiture for nonperformance, a mere breach of such terms will not authorize the cancellation of the contract. Tripplehorn v. Ladd-Hannon Oil Corp., Texas Civ. App., 8 S. W. (2d) 217, writ dismissed 118 Texas 195, 13 S. W. (2d) 666; Chicago, T. & M. R. Co. v. Titterington, 84 Texas 218, 19 S. W. 472, 31 Am. St. Rep. 39.

The case of W. T. Waggoner Estate v. Sigler Oil Co., 118 Texas 509, 19 S. W. (2d) 27, is one of the leading cases of this Court relating to the right of forfeiture under an oil and gas lease. The Waggoner Estate contended in that case that the Sigler Oil Company had failed to comply with the terms of its contract, and sought a forfeiture thereunder. In a very able and exhaustive opinion Mr. Justice Greenwood reviewed the authorities upon this question, and announced certain well-settled rules regarding oil and gas leases. In that opinion, after stating such rules and after quoting from many authorities, it was further said:

"More recently the rule declared by Judge Stayton was reaffirmed when the court said:

" 'The authority to forfeit a vested right or estate should not rest in provisions whose meaning is uncertain and obscrue. It should be found only in language which is plain and clear— whose unequivocal character may render its exercise fair and rightful.' Decker v. Kirlicks, 110 Texas 94, 216 S. W. 386.

"In Grubb v. McAfee, 109 Texas 532, 212 S. W. 464, approved in Texas Co. v. Davis, 113 Texas 335, 254 S. W. 304, 255 S. W. 601, the court refused to hold that the implied obligation for continued development in the ordinary oil lease was a condition subsequent, quoting from the opinion of Justice Bonner in Johnson v. Gurley, 52 Texas 222, 227. In the latter opinion the court said:

" 'The breach of a condition does not, of itself, divest the estate of the lessee, but to do this the lessor must, by express act, take advantage of the same by re-entry, or that which in law would be equivalent thereto. (1 Wash. on Real Prop. (3d Ed.) marg. p. 319; Taylor's Land. and Ten., sec. 273; Fifty Associates v. Howland, 11 Metc. [Mass.] 99; Elliott v. Stone, 1 Gray [Mass.] 575.)

\* \* \* \* \* \*

" 'In case of doubt as to the true construction of a clause in a lease, it should be held to be a covenant, and not a condition or limitation, as the law does not favor forfeitures. (1 Wash. on Real Prop. (3rd Ed.) marg. pp. 319, 320; Taylor's Land. and Ten., sec. 273; 4 Kent's Comm., marg. p. 129; Wheeler v. Dascomb, 3 Cush. [Mass.] 288.' "

■ The assignments of the oil and gas leases covering the Grossman and Boerner tracts do not contain any condition the nonperformance of which would justify the leases to be forfeited. It is true that these assignments were placed in escrow under an agreement which provided that they were not to be delivered until certain drilling obligations were performed by the Henshaw Brothers. It is also true that the joint venture agreement, dated August 28, 1940, stated that Henshaw Brothers "have the right to acquire" the leases, and that when acquired "they shall be owned, held and handled pursuant to this agreement." However, the parties themselves, by their agreement dated October 1, 1940, expressly ignored the above-stated provisions, and agreed that the leases should be delivered from escrow in another manner. The fact that the parties in this supplemental agreement provided that the terms of the original joint venture agreement should remain in force, did no more than create some doubt as to the meaning of the contracts, and under the rule stated above this doubt must be resolved by determining that the obligations expressed in the contracts were merely covenants and not conditions. Furthermore, it is shown that a joint agreement was entered into by petitioners and respondents to the effect that the proceeds derived from the sale of oil and

gas should be sent to the Boatmen's National Bank of St. Louis, Missouri, until certain charges in favor of respondents were discharged; and that payments were made under this agreement until March 14, 1946, when the Henshaws advised Southern Minerals Corporation to suspend the payments until a settlement could be reached between petitioners and respondents. Up to that time no effort was made by respondents to forfeit the leasese. However, the parties failed to reach an agreement, and hence this lawsuit was instituted by respondents. They did not seek damages against the Henshaws for a breach of any obligations under the covenants, but asked for a judgment cancelling the rights claimed by the Henshaws and vesting in themselves the title to the mineral leases.

Perhaps, when considered alone, certain provisions in the various contracts could be construed as having authorized the respondents to declare a forfeiture of the rights of the Henshaws thereunder. Respondents did not avail themselves of this right, but they continued to execute new and additional contracts and operated thereunder. Neither could respondents have construed the contracts as covenants and operated under them as such, and then later repudiated such construction of the contracts and then declare a forfeiture of the rights of the Henshaws as fixed by the terms of the contracts.

The division orders which were executed by all the interested parties to the Southern Minerals Corporation state that Henshaw Brothers own one-half of the working interest in both the Grossman No. One well and the Boerner No. One well. Further, in the arrangement made on October 1, 1941, for the forwarding of the proceeds from the sale of oil and gas to Boatmen's National Bank of St. Louis, Missouri, it was stated by both parties that the Grossman and Boerner leases were "owned and operated by us." These facts make this situation analagous to one where there is a covenant for development in an oil and gas lease providing that the lessee's interest will be forfeited in case of a breach, and the lessor has not exercised his right to declare a forfeiture, but rather has pursued a course of conduct inconsistent with forfeiture after the lessee has clearly violated the covenant. This Court has recently held that to declare a forfeiture in such a situation would be unjust, and has refused to do so. Hoover v. General Crude Oil Co., 147 Texas 89, 212 S. W. (2d) 140.

■ Applying the foregoing rules to the facts of this case, the Henshaws retain the title acquired by them to the leases in

question, and remain obligated to pereform their "contributions" under the joint venture agreement. It is true that certain drilling obligations were never performed by the Henshaws. When construed in the light of the undisputed testimony and the acts of the parties relating thereto, this amounted to a breach of promissory obligations, and did not support a cause of action for forfeiture, but gave rise to an action for damages for a breach of those obligations. Glen Rose Collegiate Institute v. Glen Rose Ind. School Dist. No. 1 et al, Texas Civ. App., 125 S. W. 379, writ refused; Chicago, T. & M. Ry. Co. et al v. Titterington et ux, supra; Waggoner Estate v. Sigler Oil Co., supra; Berryman v. Schumacher, 67 Texas 312, 3 S. W. 46; 31 Am. St. Rep., 39.

We have carefully considered this record, and conclude that the trial court and the Court of Civil Appeals erred in holding that, under all the facts and circumstances, respondents were entitled to have the rights of the Henshaws under the contracts cancelled and vested in respondents. We have decided to reverse the judgments of the trial court and the Court of Civil Appeals and remand this cause for further proceedings consistent with this opinion.

Opinion delivered January 5, 1949.

Rehearing overruled February 2, 1949.