Eugene SIMPSON, Appellant,

v.

D. D. McCAIN et al., Appellees.

No. 3382.

Court of Civil Appeals of Texas.

Waco.

Oct. 18, 1956.

Rehearing Denied Nov. 15, 1956.

Biggers, Baker, Lloyd & Carver, Ralph D. Baker, Kenneth C. Stephenson, Dallas, for appellant.

Malone, Lipscomb & Seay, Dallas, for appellees.

TIREY, Justice.

This is a suit by two remaining partners of a general insurance agency against the third partner, Simpson, to recover life insurance renewal commissions earned by Simpson prior to April 1, 1951. Appellees' suit is grounded on three separate contracts. The first contract was entered into by D. D. McCain, Eric Gambrell and Eugene Simpson on April 1, 1951; on February 1, 1953, after the death of Gambrell, a new partnership agreement was entered into between McCain and Simpson; on September 1, 1953 a new partnership agreement was entered into between McCain and Simpson and Frank M. Caldwell. The parties operated under this last agreement until July 1, 1954, at which time Simpson withdrew from the partnership by agreement and for a consideration hereinafter stated.

The first partnership agreement, among other things, provided:

"1. The partnership shall operate under the name of Seay & Hall, but the partners may, by mutual consent of all partners, use additional names or trade names in connection with portions of its business. The partnership business shall be a general agency insurance business, and such other business as the partners may mutually agree upon, carried on in Dallas

County, Texas, and such other places as the partners shall mutually agree upon.

"The capital of the partnership is $40,000.00 owned as follows: 40% by D. D. McCain; 40% by Eric Gambrell; 20% by Eugene Simpson. The capital accounts shall be the aforesaid $40,-000.00 plus net earnings minus net losses and partnership distributions from year to year. Additional capital contributions and capital *withdrawals,* which would have the effect of changing the ratio of ownership of the capital account, shall not be made without the consent of all partners. Each partner's percentage interest in each and all the assets of the partnership shall be the same as his percentage interest in the capital account."

Section 3 provides in effect that McCain would share in 40% of the profits, Gambrell 40% and Simpson 20%. The paragraph further provided:

" 'Net profits' and 'net losses' as herein used shall be determined in accordance with generally accepted accounting principles, and in the computation thereof no partner shall be entitled to any salary."

Section 4 of the contract provided in part:

"Each partner shall devote his entire time and best efforts to the conduct and furtherance of the partnership business * * *."

The contract agreement between McCain and Simpson entered into on the 1st of February 1953 provided that the capital stock of the partnership would be the sum of $30,000, owned as follows: 66⅔% by McCain and 33⅓% by Simpson. This contract provided that the net profits of the partnership would be shared and the net losses be borne by the partners in the ratio of McCain 66⅔% and Simpson 33⅓%.

On September 1, 1953 a new partnership agreement was entered into between Eugene Simpson, D. D. McCain and Frank M. Caldwell. This partnership agreement provided for capital stock to consist of $40,000, owned 40% by McCain, 40% by Simpson and 20% by Caldwell. The net profits were to be shared in the same ratio and the contract provided that the net profits and the net losses shall be determined in accordance with generally accepted accounting principles, and in the computation thereof no partner shall be entitled to any salary.

On July 1, 1954 a new contract was executed between the parties, under the terms of which Simpson, for a valuable consideration, withdrew from the partnership. Pertinent to this discussion the contract provided:

"Simpson does here contract and agree to sell and does hereby upon the performance of the terms and conditions hereinafter set out bargain, sell and convey all the right, title and interest of Simpson in and to the partnership of Seay & Hall including but not limited to, its name, its assets, real and personal, and all other property, rights, or value of whatever nature, character, or description which Seay & Hall own or may be entitled to."

The contract further provided that McCain and Caldwell agreed to pay Simpson in consideration of Simpson's sale to McCain and Caldwell of his interest in Seay & Hall the sum of $22,500.00.

Section 7 of the contract provided:

"As a part of the consideration for the execution of this agreement Simpson covenants and agrees that for a period of five years from and after the date of this instrument he will not, directly or indirectly, engage in the insurance business in Dallas County, Texas, except for the solicitation and writing of life, health, accident, hospi-

talization, group and catastrophe medical expense policies."

Section 8 provided:

"Simpson, McCain and Caldwell each agree to make, execute and deliver such bills of sale, notes, conveyances and other instruments necessary to carry out and execute the terms of this agreement."

Section 9 provided:

"It is expressly agreed and understood that this instrument contains the full agreement between the parties hereto, and supersedes any and all agreements, and amendments thereto, which may have been heretofore entered into between them. It is further agreed and understood that no change, amendment, alteration, or modification of this instrument shall be valid and binding unless reduced to writing, signed and acknowledged by all of the parties hereto, and a fully executed copy delivered to each party."

Evidence was tendered to the effect that prior to April 1, 1951 McCain and Gambrell were conducting a general insurance agency as co-partners under the firm name of Seay & Hall, and that they did not write life insurance; that defendant Simpson was carrying on a general insurance agency, a substantial portion of which business consisted of life insurance and group hospital insurance; that during the negotiations discussion was had with reference to merging the two agencies and the value of the businesses and the amount of profits, including Simpson's life insurance and group hospital business, and the testimony further indicates that the partnership agreement was based upon the showing of each business in the preceding year of 1950. Testimony was also tendered to the effect that all of the assets and all of the business in force of the old partnership of Seay & Hall, which was owned by McCain & Gambrell, was included in the trade and were used to pay for their 80% of said

business, and that all of the assets and business in force, including the life insurance of the agency of Eugene Simpson, were included in said trade and were used to pay for his 20% in said business, and that these assets became the property of the new partnership; that during the period of said partnership Simpson collected and turned over to the partnership renewal commissions on business on his books on life and hospitalization policies written prior to the time he entered said new partnership (which was April 1, 1951) and initial premiums on new business after he had entered the partnership. The foregoing evidence is without dispute. We think the evidence shows the foregoing situation continued throughout the partnerships here under consideration until the withdrawal agreement executed in July 1954.

It was Simpson's contention in the court below and his contention here that he is entitled to recover all life insurance renewal commissions on the business that he wrote prior to April 1, 1951. It is appellees' position here that under the terms of the partnership agreement entered into between the parties here set out that appellant Simpson was obligated to turn over to Seay & Hall renewal commissions on life and hospitalization policies written prior to April 1, 1951, as well as those written after April 1, 1951 until the date Simpson withdrew from the partnership in July 1954.

At the conclusion of the testimony the court overruled motions filed by appellant as well as appellees for instructed verdict. Prior to the submission of the cause to the jury the parties stipulated certain facts relating to the premiums and commissions that were due on policies written during the time here in controversy. The court submitted the cause on three special issues. Absent the burden of proof clause, they are substantially as follows:

1. Do you find that at the time that McCain, Gambrell and Simpson entered into the partnership agreement of April 1, 1951 that the renewal commissions on life

insurance, group life insurance, and group hospitalization insurance of the Simpson agency became the property of the new partnership of Seay & Hall? to which the jury answered "Yes."

2. Do you find that in July 1954, when defendant Simpson sold his interest in the partnership of Seay & Hall and transferred and conveyed his interest to plaintiffs, it was the intention of the parties that such transfer included all renewal commissions on life, group life and group hospitalization policies written prior to July 1, 1954? to which the jury answered "Yes."

3. Do you find that there was not an understanding between McCain and Gambrell and Simpson, made prior to the signing of the partnership agreement of April 1, 1951 that all life insurance commissions and renewal commissions on life, group life and group hospitalization policies should be turned over to the partnership of Seay & Hall? "Answer 'It was not the understanding' or 'It was the understanding' as you understand the facts to be", and the jury answered "It was the understanding."

The court overruled defendant's motion for judgment non obstante veredicto and granted appellees' motion for judgment on the verdict of the jury and upon the stipulations agreed upon, and in the decree we find this recital: " * * * and the court being of the opinion that under the verdict of the jury, the undisputed evidence and Stipulation of Facts of the parties on file in evidence and of record in open court that all future renewal commissions on all such policies are the property of and to be paid to the plaintiffs, D. D. McCain and Frank M. Caldwell * * *." The court then decreed that McCain and Caldwell recover from defendant Simpson the sum of $5,449.55, with 6% interest from date of judgment until paid. The decree also provided for certain credits on the judgment that are not pertinent to this discussion.

Points 1 and 2 assail the judgment for failure to grant appellant's motion for in-structed verdict. The 6th point assails the judgment for failure of the trial court to grant appellant's motion for judgment notwithstanding the verdict of the jury and to disregard answers of the jury to special issues submitted. We overrule each of the foregoing points.

As a reviewing court, it is our duty to consider the evidence and the inferences properly to be drawn therefrom in the light most favorable to the party obtaining the verdict, and it is our duty, in considering controverted issues of fact, to accept as true that testimony which tends to support the verdict. 3-B Tex.Jur. pp. 370 and 372. Moreover, "Where the facts are controverted, or are such that different inferences may be reasonably drawn therefrom, an issue of fact is raised; it is only where the evidence is harmonious and consistent, and the circumstances permit of but one conclusion, that the question becomes one of law for the determination of the court. An issue of fact is raised 'if, discarding all adverse evidence, and giving credit to all evidence favorable to the plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff.'" (Citing cases.) See Olds v. Traylor, Tex.Civ.App., 180 S.W.2d 511, 514, points 8 and 9 (writ ref.). Moreover, " 'It was the jury's province to weigh all of the evidence, to decide what credence should be given to the whole or to any part of the testimony of each witness. "The jury were the judges not only of the facts proved, but of the inferences to be drawn therefrom, provided such inferences were not unreasonable." ' " See Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194, at page 199, point 6. No rule is better settled than the one to the effect that if there is evidence of probative value to sustain the findings of the jury, the appellate court is bound by such findings. See Lynch v. McLendon, Tex.Civ.App., 283 S.W.2d 88, point 3 (no writ history) and cases there collated.

In considering this cause, we must bear in mind the above rules and the foregoing testimony tendered, and the other testimony of appellant where he testified to the effect that in September 1944 he became a contract agent for the Aetna Life Insurance Company and also entered the fire and casualty insurance business, representing the Aetna Fire & Casualty Insurance Company; that he had previously been in the life insurance business only and that he took on that additional obligation in order to build a fire and casualty insurance business that he operated under the name of E. Simpson Insurance Agency from September 1944 until April 1, 1951, when he became a member of the firm of Seay & Hall; that when appellant and Eric Gambrell were getting ready to form a partnership to operate under the name of Seay & Hall, appellant discussed with McCain and Gambrell the amount of the net profits that he was making through his agency during the year of 1950, and that he advised McCain and Gambrell that he had netted during the year 1950 approximately $8,000; that just prior to April 1, 1954 his main business was the writing of fire and casualty insurance but that he also wrote life insurance policies occasionally, as well as group life and hospitalization policies; that with reference to the sum of $8,000 referred to as the net profits, it included commissions he received from fire and casualty insurance, as well as commissions he received from life, group life and hospitalization policies; that after he became a member of the partnership in 1951 he turned over the commissions that he received during the period from the time he entered the partnership in 1951 until he withdrew in July 1954.

Appellant further testified to the effect that the $8,000 represented the amount his agency had earned or that he had earned during 1950 and that such earnings included renewal commissions on life policies and all of the insurance business that he had written that year; that the $8,000 was determined from his income tax return for the year 1950 and that the $32,000, being the income of Seay & Hall, was determined from the income tax return of the partnership of Seay & Hall for the year 1950; that the sum of $32,000 and appellant's $8,000 made a total of $40,000, and that 80% of the capital stock was owned by McCain and Gambrell and 20% by appellant.

Appellant further testified to the effect that it was his view of the partnership arrangement that he was not obligated to put in commissions on life insurance policies written prior to April 1, 1951, but that he did voluntarily put them into the partnership profits because he was anxious to get the partnership out of debt and that he voluntarily put all of these premiums and renewal premiums coming to him from such business during the time that the various partnerships were in existence and until he made his withdrawal from the partnership in 1954. He further testified to the effect that prior to April 1, 1951, and at the time they entered into the first partnership agreement, that there was not any discussion at any time about whether appellant was going to put the renewal life premiums into the profits of the company.

"Q. Now, at the time you went into that April 1, 1951 agreement, there was not any discussion at that time * * * that you were not going to put those—the renewal life premiums—in the pot, was there? A. There was no discussion of any kind.

"Q. There wasn't any discussion about that or about the fire and casualty insurance business which you had been writing on the books and which renewals would come in there—there was no discussion about that? A. No.

"Q. But you did take all that was in the E. Simpson agency, after you got into the partnership, and put it in the pot? A. I did."

Mr. McCain, one of the partners, testified in part:

"Q. Now Mr. McCain, when the discussion came up with respect to buying out Mr. Simpson, and you and he were discussing a price, I will ask you this question: In figuring out the price you were willing to pay for his interest in the business, did you or did you not take into account the business on the books of Seay & Hall? A. That's right.

"Q. Did you first agree to the price that he wanted? A. No.

"Q. What was the final figure that you parties agreed on? A. $22,-500.00.

"Q. Was anything said at any time by Mr. Simpson about the fact he was going to take these renewal commissions with him on life policies written prior to 1951? A. Nothing was said at all.

"Q. Had you known that he was going to put the renewal commissions in his pocket after he left there and make this contention, would you have agreed to that consideration? A. Why, no."

Appellant further testified in part:

"Q. All right. Now, Mr. Simpson, the testimony is undisputed that after you became a partner April 1, 1951, with D. D. McCain and Eric Gambrell, that you did turn over life insurance and group insurance, original premiums that you wrote while you were a partner, and renewals of policies that you had written prior to April 1, 1951, to the partnership. Is that right? A. That is correct.

"Q. Why did you turn them over to the partnership? A. For the simple reason that we were indebted at that time to the sum total of $60,000.00 as a result of the purchase of J. Russell Smith Agency. I was highly interested in the partnership and it was in an effort to do everything I could for pro-ducing a dollar for the benefit of the partnership, which, of course, benefited me to put every dollar possible into the organization.

"Q. What did you say when you first turned any renewal checks over, or premium checks to the partnership? A. I showed the first renewal check to Mr. Gambrell and told him that here was a little something that could go into the pot that would help the over-all situation.

"Q. What did he say? A. He said that that was not a part of the transaction and if he were me he would not have done so.

"Q. Did you tell him you were only going to do that while you were there, while you were a partner? A. I made the statement that so long as I was a partner in that firm I would continue to put those renewals into that firm.

"Q. And that is all that was said? A. That is all that was said. * * *

"Q. Did Mr. Gambrell or Mr. McCain or Mr. Caldwell at any time during all this time, either in the first partnership or as the other partnerships came along, did any of those men at any time ever make demand on you to give them any kind of a written assignment of renewal premiums on life or group or commissions? A. No, definitely not."

It is without dispute that during the life of the first partnership agreement that appellant had a drawing account of $600 per month; that when the first partnership agreement was ended and appellant became a partner with McCain, the capital account was $30,000, owned as follows: 66⅔% by McCain and 33⅓% by Ernest Simpson. The net profits of the partnership were to be shared and the net losses were to be borne in the foregoing proportions. The monthly drawing account of McCain was $750 and that of Simpson

$600. When the partnership agreement between McCain, Simpson and Caldwell was entered into on the 1st of September, 1953, it was still operating under the firm name of Seay & Hall and the capital stock of the partnership amounted to the sum of $40,000, owned 40% by McCain, 40% by Simpson and 20% by Caldwell. The net profits and losses were shared in the same proportion. Under the partnership agreement McCain and Simpson each had a monthly drawing account of $750, and Caldwell of $600. The parties operated under the last contract until July 1954, at which time appellant withdrew from the partnership and after negotiations appellant agreed to sell and appellees agreed to buy appellant's interest in the partnership for the sum of $22,500.

Neither appellant nor appellees pleaded fraud, accident or mistake with reference to the written contracts fixing the rights of the parties. It is also without dispute that when entering into the first contract, appellant and appellees relied upon the income shown in their respective income tax returns for the year 1950. Both appellant and appellees were engaged in what certainly could be called a general insurance business, but whether it was general or specific we think is beside the point, because the partnership agreement was based solely upon the earnings of the respective parties for the year 1950, as shown in their income tax returns for that year. There was no discussion by appellant that he was reserving any premiums or commissions or any income that he might receive from the insurance business in which he was then engaged. Such was true of the appellees. Appellant, as well as appellees, appear to have made a full disclosure of the types of insurance business that they were writing, and needless to say each had a right to rely upon the representations of the parties and the returns made upon their income tax returns for the year 1950 as a basis for a partnership agreement.

Under the foregoing undisputed conditions, as well as all the testimony tendered in this cause, we are of the view that the rule announced by our Supreme Court in Henshaw v. Texas Natural Resources Foundation, 147 Tex. 436, 216 S.W. 2d 566, at page 570, points 1–3, is applicable here. The rule there stated is: "If there is any doubt about the meaning of the various terms of the contract before us, the Court may consider the interpretation placed upon them by the parties themselves. In this instance the acts of the parties indicated the construction mutually placed upon the contracts at the time, including the acts done in their performance, and same are entitled to great if not controlling weight. The practical construction placed upon a contract by the parties themselves constitutes the highest evidence of the intention of the parties that whatever was done by them in the performance of the contract was done under the terms of the contract as they understood them, and as under the terms of the contract it was intended should be done." (Citing cases.) Our Supreme Court has not seen fit to change the rule there stated.

We have reviewed the entire testimony in this cause with our utmost care, and likewise have so considered each of the partnership agreements. Bearing in mind each of the provisions of the contracts and the undisputed evidence on which the first contract was based, as well as the actual interpretation given by the parties to the first contract, and subsequent ones, as shown by their actions by which the terms of the contracts were performed, it is our view that the court did not err in overruling appellant's motion for instructed verdict, nor his motion for judgment non obstante veredicto. We are also of the further view that the record on the whole is ample to support the verdict of the jury, and that the application of the foregoing rule of law to the factual situation here presented requires that the judgment of the lower court be affirmed.

We have considered each of the other points asserted by appellant, and we are of

the view that they do not present error and each is overruled.

Accordingly, the judgment of the trial court is affirmed.

HALE, J., took no part in the consideration and disposition of this case.