**AFFILIATED CAPITAL CORPORATION,**
Appellant,

v.

**SOUTHWEST, INC. and Chester J. Reed, Appellees.**

No. 01–91–01030–CV.

Court of Appeals of Texas, Houston (1st Dist.).

July 22, 1993.

---

Herbert Lackshin, Houston, for appellant.

Kenneth T. Fibich, Michael J. Zomcik, Houston, for appellees.

Before DUGGAN, DUNN and MIRABAL, JJ.

## OPINION

DUGGAN, Justice.

This is an appeal from a bench trial judgment in a suit arising from a failed land development agreement.

Affiliated Capital Corporation ("Affiliated"), the plaintiff and counter-defendant below, is the appellant. Southwest, Inc. ("Southwest") and Chester J. Reed ("Reed"), defendants and counter-plaintiffs below, are the appellees.

We affirm.

In March, 1987, Affiliated entered into an agreement with Mary Lou Hanzelka ("Hanzelka") to develop, primarily for residential purposes, 291.52 acres of land held by Hanzelka in trust for Southwest. The agreement was drafted by Affiliated's attorney. Affiliated's principal is Billy Goldberg. Reed, who wholly owns Southwest, guaranteed Hanzelka's and Southwest's obligations under the agreement. Sections seven and eight of the agreement read as follows:

7. *Land Sales.* As from time to time the Land will become available for sale, Affiliated shall undertake to find buyers for same at prices and under contracts agreeable to Owner. Net proceeds from sales of lots shall be divided equally between Owner and Affiliated. Said division of net proceeds shall not be construed as creating a partnership between Affiliated and Owner, but same is merely a device whereby it is determined what is to be paid to Affiliated for performing its services under this Agreement. The "net proceeds of sale" from the sale of any lot shall be determined by deducting from the gross sales proceeds the following items:

(i) The repayment of the land and development loan plus interest;

(ii) All closing costs, including without limitation, title company costs, title policy costs, attorneys fees, recording costs, tax prorations, real estate commissions, and other closing costs related to the sale of the land;

(iii) A sum equal to 2% of the gross sales price of the Land, which sum shall be paid to Affiliated for providing a project manager, general administrative costs, and for providing unaudited statements to owner on a regular basis. Affiliated will not receive any real estate commissions for sales of the land, that it arranges.

The sums to be paid to Affiliated pursuant to this Section 7, shall be the total consideration to be paid to Affiliated for the performance of its duties under this Agreement. The 2% sum referred to in iii above shall be paid to Affiliated from time to time as parcels of the land are sold. The net proceeds for a sale shall be applied as follows: (a) To a reserve account for income tax and then (b) To repay Affiliated for advances (hereinafter defined) with interest; then the remaining sums to (c) A reserve account for one year estimated carrying costs and (d) then to reduce any indebtedness on the property, and then any remaining sums to (e) be divided on a 50–50 basis between the parties upon a mutually agreement [sic] timetable.

8. *Municipal Utility District Refunds.* To the extent any sums extended in the development of the Land are refunded by the Municipal Utility District, said refunded sums including interest on all sums advanced shall be used to reduce any indebtedness on the land and then after such indebtedness is paid off divided equally between Owner and Affiliated. This provision shall survive the sale of the last parcel of land.

During the term of the agreement, Affiliated advanced funds to pay interest on existing loans and to pay ad valorem taxes. Affiliated was repaid $2,000,000 of these advances from a development loan, obtained from Heights Savings and secured by a lien against a large portion of the land, and $755,531.50 from utility district refunds. At the time the agreement terminated, the sum of $2,852,850 in advanced funds remained unpaid to Affiliated.

After several extensions, the development loan fell due and was not paid. Heights Savings then foreclosed on its lien and purchased the land at the trustee's sale. Affiliated then sued Southwest and Reed for breach of the development agreement and declaratory judgment; Southwest and Reed counterclaimed against Affiliated, alleging that Affiliated had breached the agreement. The trial court found as a conclusion of law that, pursuant to an agreement of the parties in open court during trial, the contract was not ambiguous.

The trial court's judgment (1) decreed that Affiliated and Southwest each owned an undivided one-half interest in the remaining 3.3932 acres of land, (2) awarded Affiliated attorney's fees of $60,000, (3) denied Affiliated reimbursement from Southwest and Reed for $2,852,850 in development funds Affiliated expended and did not recover, and (4)

denied Affiliated's claims that Southwest and Reed breached the development agreement and their duty of good faith and fair dealing.

In its first six points of error, Affiliated argues that the trial court erred in not imposing liability on Southwest and Reed for the money spent by Affiliated in the development effort which was not repaid. Affiliated argues that section seven of the agreement is a covenant to repay rather than a condition precedent to repay, and that sections seven and eight do not provide the only two methods for repayment of the money Affiliated advanced.

Southwest and Reed do not contest Affiliated's position that section seven sets out a covenant, rather than a condition precedent. It is the position of Southwest and Reed that the agreement is clear and unambiguous, and the trial court properly construed its meaning.

The parties stipulated in the trial court that the contract is not ambiguous. The trial court's findings of fact included the following:

11. Affiliated contracted, pursuant to Section 6 of the Agreement, to arrange or obtain the funds so that the carrying costs, including interest accruing on the loan on the land and ad valorem taxes (the "advances"), would be timely paid when such costs became due.

12. The only two methods for repayments of Affiliated's advances were: (1) Section 7 of the Agreement, which provided that Affiliated's advances would be repaid from the proceeds of the sales of the land; and, (2) Section 8 of the Agreement, which provided that advances could also be repaid from Municipal Utility District ("MUD") refunds.

13. The Agreement did not impose on any Defendant an obligation to personally repay Affiliated's advances other than from the sales of land or MUD refunds pursuant to the terms of the Agreement.

Affiliated argues that the trial court's findings resulted in a forfeiture of more than $2,000,000 that Affiliated had advanced and was not repaid. Southwest and Reed respond that they never realized a penny out of Affiliated's efforts in the development of the land, and in fact they lost their land to foreclosure while Affiliated realized a total of more than $11,000,000 during the eight-year course of the land development.

While forfeitures are not favored in the law, *Parham v. Glass Club Lake, Inc.*, 533 S.W.2d 96, 99 (Tex.Civ.App.—Texarkana 1976, writ ref'd n.r.e.), no forfeiture has occurred here. A forfeiture occurs where a party "loses some right, property, privilege or benefit in consequence of having done or omitted to do a certain act." *State v. Compton*, 179 S.W.2d 501, 503, 142 Tex. 494 (1944). That has not happened here; Affiliated was not repaid the monies it had advanced because the sale of land did not occur. No forfeiture took place.

Affiliated also argues that we should consider the parties' actions as evidence of how the parties themselves construed the agreement. We disagree. Affiliated cites *Henshaw v. Texas Natural Resources Found.*, 216 S.W.2d 566, 147 Tex. 436 (Tex. 1949), where the court considered the acts of the parties where there was "some doubt as to the meaning of the contracts." *Id.* 216 S.W.2d at 571. Here, there is no doubt. "Only where a contract is first found to be ambiguous may the courts consider the parties' interpretation." *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 732 (Tex.1981). "Where the meaning of the contract is plain and unambiguous, a party's construction is immaterial." *Id.*

We also reject Affiliated's arguments that sections seven and eight did not provide the only two methods for repayment of the money Affiliated advanced, and that section seven "does not state that the only source of funds to repay [Affiliated] are proceeds from land sales." Section seven specifically states that the sums to be paid Affiliated from land sales "shall be the total consideration to be paid to Affiliated for the performance of its duties under this Agreement."

The trial court was correct in not imposing liability on Southwest and Reed for money expended by Affiliated in the development process but not repaid. Further, Affiliated was not entitled to receive repayment of the

advances it made from any source beyond sections seven and eight.

We overrule points of error one through six.

▪ In points of error seven through 10, Affiliated contends the trial court erred in finding that the development agreement did not require Southwest and Reed to renew or refinance the development loan, and in failing to find that Southwest and Reed breached their duty of good faith and fair dealing.

Affiliated points to no language in the agreement that requires Southwest or Reed to renew or refinance the development loan, and we find none. Rather, Affiliated argues that because it and Southwest and Reed became joint owners of the property, Southwest and Reed were required to act in good faith toward Affiliated.

The trial court's finding of fact included the following:

6. The development of Parkridge was the first business deal Affiliated or Goldberg had done with Southwest or Reed, although Reed and Goldberg had known each other for a number of years. The prior relationship between Reed and Goldberg was that ordinarily expected of businessmen.

7. Both Goldberg and Reed were sophisticated, knowledgeable businessmen, with many years of experience in real estate and development.

8. The Agreement was drafted by Affiliated's attorney, and was the result of arms-length negotiations, not the result of overreaching, undue influence or other improper means.

9. There was no special or confidential relationship between Affiliated and any of the Defendants.

10. As expressly provided in Sections 7 and 12 of the Agreement, Affiliated and the Defendants did not form a joint venture or partnership.

These findings are supported by the evidence.

▪ A duty of good faith and fair dealing is recognized when the parties to the contract have a special relationship. *Cockrell v.* *Republic Mortgage Ins. Co.,* 817 S.W.2d 106, 116 (Tex.App.—Dallas 1991, no writ); *Texstar North America, Inc. v. Ladd Petroleum Corp.,* 809 S.W.2d 672, 677 (Tex.App.—Corpus Christi 1991, writ denied). A "special relationship" arises when the parties possess unequal bargaining power and the nature of the business is such that one party can easily take advantage of the other. *See Arnold v. National County Mut. Fire Ins. Co.,* 725 S.W.2d 165, 167 (Tex.1987). The record here indicates that the parties all had substantial business experience and acumen, particularly in the field of real estate development. No claim has been made that the parties had unequal bargaining power, and nothing in the record would substantiate such a claim. Nor does it appear that either party could easily take advantage of the other.

Southwest and Reed had no "special relationship" with Affiliated, and thus no duty of good faith and fair dealing arose. The mere fact that the parties became joint owners of the land, taken by itself, would not have given rise to a "special relationship." *See* *McDonald v. Follett,* 180 S.W.2d 334, 337, 142 Tex. 616 (1944) ("Whether or not joint owners ... sustain relations of trust and confidence toward each other depends upon the facts and surrounding circumstances. They do not sustain that relationship by virtue alone of their being joint owners.").

The trial court did not err in finding the development agreement did not require Southwest or Reed to renew or refinance the development loan, or in failing to find that Southwest and Reed breached a duty of good faith and fair dealing.

We overrule points of error seven through 10.

▪ In their sole cross-point, Southwest and Reed assert the trial court erred in awarding Affiliated an undivided one-half interest in the 3.3932 acres of land covered by the development agreement and not foreclosed upon. Affiliated did not respond to Southwest's and Reed's cross-point. The termination of the agreement and its consequences to the parties are governed by section nine of the agreement, which states in relevant part:

*Term.* The term of this Agreement shall commence on the date hereof and end five (5) years from the date hereof, unless extended by mutual agreement. If at the end of the term of this Agreement, *and said term is not extended as herein provided,* then Affiliated and owner shall become joint owners of the remaining land, subject to any indebtedness.

(Emphasis added.) It is undisputed that the agreement commenced on March 16, 1977, for a five year period, that it was extended by mutual agreement for an additional three year period, and that it terminated on April 16, 1986.

Southwest and Reed, as cross-appellant—owner, assert that the phrase "and said term is not extended as herein provided," in section nine's second sentence "becomes meaningless unless it is construed to mean that joint ownership arises only if the Development Agreement is not extended beyond its primary term." We disagree. Section nine can reasonably be construed to mean that, at the end of the term of the agreement, Affiliated would become a joint owner of the land, provided that the "end of the term" means not the end of five years, or the end of any specific extension period, but rather the actual end of the agreement. In other words, joint ownership does not vest so long as the agreement is still in effect through mutual extensions; it is only when the agreement is actually terminated that joint ownership vests.

The trial court's construction of section nine is consistent with the purpose and meaning of the development agreement as a whole. We overrule the cross-point.

We affirm the judgment.