## HENSHAW et al. v. TEXAS NATURAL RESOURCES FOUNDATION et al.

No. 11816.

Court of Civil Appeals of Texas.
San Antonio.

May 19, 1948.

Rehearing Denied June 23, 1948.

Kelso, Locke & King, of San Antonio, Neel, King & Rachal, of Corpus Christi, for appellant.

Davenport & Ransome, of Brownsville, and Chas. H. Clark, of Corpus Christi, for appellee.

NORVELL, Justice.

Henshaw Brothers and Monday Oil Company (who claim under Henshaw Brothers) have appealed from a judgment which awards to Texas Natural Resources Foundation a recovery of oil and gas leasehold estates in a 178 acre tract of land referred to in the briefs as the "Grossman" and a 178.35 acre tract referred to as the "Boerner", both tracts being located in Jim Wells County. The judgment also made disposition of monies in the possession of Southern Minerals Corporation as a stakeholder and allowed that corporation certain sums for attorney's fees.

Trial below was to the court without a jury. Upon request, full findings of fact and conclusions of law were prepared and filed. The case turns upon the construction of detailed and involved contracts entered into between the parties and their predecessors in interest. The findings of fact and conclusions of law occupy seventeen pages of the transcript. After a careful examination of these findings and conclusions, we are of the opinion that the findings are in accordance with the evidence and the conclusions state the law properly applicable to the facts. We adopt such findings and conclusions as the findings and conclusions of this Court. Rule 453, Texas Rules of Civil Procedure. This will enable us to state in briefer form the controlling considerations which we believe call for the affirmance of the judgment appealed from.

The appellants contend that the judgment below had the effect of "forfeiting" their interests in the "Grossman" and "Boerner" leases. Appellees, upon the other hand, contend that no *beneficial* interest in and to the leases has ever vested in appellants under the contracts.

The fundamental difference between the parties is one of factual analysis. There are no questions of conflicts of decision or of distinguishing authorities presented. If appellants' analysis be accepted their position has abundant support in the authorities, and the same may be said as to appellees.

■ As we view it, a few elementary principles of law and the wording of the contracts control this case. The applicable rules of law may be stated as follows:

A trust arises upon the division of an estate into two parts, legal and equitable, and "a trust is the legal relationship between one person having an equitable ownership in property and another person owning the legal title to such property, the equitable ownership of the former entitling him to the performance of certain duties and the exercise of certain powers by the latter, which performance can be compelled in a court of equity." 54 Am.Jur. 21, § 4.

■ An equitable title in Texas has been defined as "the present right to the legal title. * * * Such an equitable title is available in the statutory action of trespass to try title." Pegues v. Moss, Tex.Civ.App. 140 S.W.2d 461, 471, wr. dism. agr.

■ When a trust becomes passive or dry the holder of the beneficial interest in property may recover the legal title from the trustee.

Appellees' pleadings of fact in the lower court were full and complete and their recovery essentially depends upon the principles or doctrines of law above stated.

■ The evidence discloses that on August 28, 1940, the Code Oil Company (predecessor in title of Texas National Resources Foundation) as "Company" and Walter A. Henshaw and Paul A. Henshaw as "Operators" entered into a written contract which they designated as a "joint venture agreement." This original contract is long and detailed and contains five major divisions, designated as "Operators' Contributions", "Company's Contribution", "Joint Operations", "Operators' Special Financing" and "General Provisions."

Attached to the contract as exhibits were a number of copies of written instruments, such as escrow agreements, assignments of oil and gas leases, etc.

On the first page of the contract under the heading "Operators' Contributions" appears the following provision:

"Operators *have the right to acquire* two certain assignments of oil, gas and mining leases (covering the Grossman and Boerner tracts) under an escrow agreement between C. G. Malott, Trustee, and J. Luther Knies, Trustee, as Parties of the First Part, and themselves as Parties of the Second Part, dated August 15, 1940, a copy of which agreement is attached hereto, marked Exhibit 'A', and incorporated herein by reference, and in the event those assignments are delivered to Operators from escrow under the provisions of the escrow agreement, *they shall be owned, held and handled pursuant to this agreement."* (Italics ours.)

It seems clear enough at the outset that the contract purported to provide a means whereby operators could acquire an interest in certain oil and gas leases and that said leases when acquired would be held in trust and "owned, held and handled pursuant to (the) agreement."

Also, under the head of "Operators' Contributions", Henshaw Brothers agreed that they would, at their sole cost and expense, drill a well designated as "First Operation" and upon completion of said well as a commercial producer operators would assume, discharge and perform the operations designated as "Second Operation" and "Third Operation."

By the contractual provisions relating to "First Operation", Henshaw Brothers agreed to begin drilling within thirty days upon a designated location and drill to 5500 feet and 6000 feet, as the Company might designate, or until oil or gas in paying quantities was encountered and produced.

The contract provided for three varying results which would take place upon the

completion of the well or cessation of drilling:

1. If the well should be a dry hole the operators were to be paid out of money deposited with the escrow agent by the Company at the rate of $1.60 per lineal foot and the contract would be considered as fully performed and "the venture terminated."

2. In the event the well be a commercial producer, the escrow agent out of money deposited by the Company agreed to secure delivery of the two lease assignments, in which operators were named as assignees and pay therefor the sum of $25.00 per acre. Operators agreed to assign to the Company an undivided one-half interest in the leases and in addition thereto agreed to expend for the benefit of the joint venture the sum of $70,000 in drilling operations as provided for under "Second Operation" and "Third Operation." It was provided that the cost of "First Operation" could be credited against the $70,000.

3. Under that part of the contract designated as "General Provisions" it was provided that in the event operators upon completion of "First Operation" did not believe it advisable to set casing, they could treat the well as a dry hole and receive their drilling money from the escrow agent. The Company, however, reserved the privilege of taking over the hole and setting casing, in which event operators would have no interest in the well or the leasehold estates.

Under the contract provisions relating to "Second Operation" Henshaw Brothers agreed to drill a second well upon the leased premises, provided the first well had been completed as a commercal producer. Likewise, as a "Third Operation," the drilling of a third well was provided for. However, in lieu of drilling these two additional wells, operators reserved the right to pay over to the Company one-half of the part remaining out of the $70,000 after deducting the actual cost of the first well, or the first two wells if this option were exercised after Operations Nos. 1 and 2 had been completed.

Operators drilled a well upon the Grossman lease (Grossman No. One) which they elected to treat as a dry hole because the sand encountered was only 2½ to 3 feet in thickness. The Company, however, elected to complete the well under the third alternative above stated. Had nothing further been done the operators would have been out of the deal and Grossman No. One would have been owned by the Company, as it paid for the drilling of the well, the setting of casings, etc., in accordance with the terms of the contract.

However, on October 1, 1940, the Code Oil Company and Henshaw Brothers entered into a supplemental agreement, the preamble and first numbered paragraph of which read as follows:

"The undersigned Code Oil Company, as 'Company,' and Walter A. Henshaw and Paul A. Henshaw, as 'Operators,' hereby supplement and amend that certain contract entered into between them under date of August 28, 1940, the original of which is attached hereto, which supplements and amendments are as follows:

"1. Company agrees to pay all costs of the drilling of the well drilled at the location designated in the original contract on the basis as therein provided, and in addition thereto agrees to pay all costs of setting pipe and completing said well and in the event same produces oil in commercial quantities, it further agrees to pay for the two lease assignments under the escrow agreement, a copy of which is marked Exhibit 'A' in the original contract, and the said well (Grossman No. 1) shall not be considered as well No. 1 under the original contract and all operations as provided for under the said original contract of August 28, 1940, shall be deferred until such time as the said parties may hereafter agree, and pending such time the said well now being completed as above referred to shall be operated pursuant to the operating agreement attached hereto * * *."

As, under the provisions of the supplemental agreement, all the terms and provisions of the original agreement of August 28, 1940, remain in full force and effect unless amended, we do not construe the October agreement as waiving the requirement that Henshaw Brothers must complete Operation No. One and bring in a commer-

cial producer in order to acquire a beneficial interest in and to the oil and gas leases involved.

On October 16, 1940, Code Oil Company and Henshaw Brothers entered into a written agreement providing for the drilling of the "Boerner No. 1" well. This agreement provided that should the financing of the Grossman No. 1 and Boerner No. 1 be handled by Henshaw Brothers said wells should be considered as Operations Nos. 1 and 2 under the original joint venture contract of August 28, 1940.

Boerner No. 1 was completed as a gas well. Henshaw Brothers did not exercise their option to finance the drilling of the two wells as "Operations Nos. 1 and 2."

Under another agreement entered into in January, 1941, the Code Oil Company and Henshaw Brothers drilled a dry hole on lands not covered by the leases here involved but in the vicinity thereof. Both parties paid their respective costs for this well. The drilling of this dry hole is probably some indication that should Henshaw Brothers now attempt to complete "Operation No. One" they would have a dry hole.

As a result of the election of Henshaw Brothers, all of the costs of drilling, etc., on the leases here involved, were paid by the Code Oil Company. Henshaw Brothers entered into agreements with reference to the handling of money derived from the wells on the leases which provided that the Code Oil Company or its successors should receive said money until all costs had been repaid in accordance with the provisions of the contracts. These agreements are detailed and it is sufficient to say here that they seemingly contemplate that sometime in the future Henshaw Brothers would complete Operation No. One. No waiver of this contractual obligation is contained in any of these contracts.

When Code Oil Company had been repaid its drilling costs under these agreements, Henshaw Brothers asserted a claim to the money derived from the sale of oil and gas from the leased premises. This claim was resisted by Texas Natural Resources Foundation, which had succeeded to all interests of the Code Oil Company. On May 1, 1946, said Foundation demanded that Henshaw Brothers proceed to discharge their obligations under the original joint venture agreement, by drilling a well at a location on the "Grossman Lease" 330 feet from the north and west lines of said lease; or at such other location as Walter A. Henshaw and Paul A. Henshaw might select. Sufficient funds to pay for the cost of drilling were tendered in escrow to pay for the well, should it prove to be a dry hole.

This demand to perform Operation No. One, under the original agreement, was not complied with by Henshaw Brothers, and some five months later, on October 14, 1946, this suit was filed.

Despite the numerous contracts and agreements entered into between the parties, the completion of the well provided for under Operation No. One, as a commercial producer, remained a prerequisite to the acquisition of a beneficial interest in the leasehold estates by Henshaw Brothers. When Henshaw Brothers elected to treat Grossman No. One as a dry hole Code Oil Company paid for the well in accordance with the provisions of the contract. When the Company completed the well and sought to produce therefrom, some provision for securing the assignments of the leases then in escrow had to be made. Code Oil Company paid for these assignments, and this action did not vest a beneficial title in Henshaw Brothers. As a result of this transaction, Henshaw Brothers acquired only the legal title and held the leases subject and pursuant to the terms of the original agreement.

Henshaw Brothers having failed, even after due demand, to perform the obligations relative to "Operation No. One," now have no right to acquire a beneficial title in and to the leases. They hold only the naked legal title. The trust is dry or passive, and consequently such legal title may be recovered by the beneficial owner of the property.

We are of the opinion that none of appellants' points present a reversible error and the judgment of the trial court is accordingly affirmed.