Thelma GRABES et vir. Appellants,

v.

Ethel O. FAWCETT, a feme sole, Appellee.

No. 6989.

Court of Civil Appeals of Texas

Texarkana.

Nov. 5, 1957.

Rehearing Denied Nov. 26, 1957.

Harold B. Berman, Dallas, for appellants.

Brown & Brown, Texarkana, for appellee.

FANNING, Justice.

This is a plea of privilege case. Appellee, Ethel O. Fawcett, a widow, sued appellants herein in the District Court of Bowie County, Texas. Appellant Thelma Grabes filed a plea of privilege to be sued in Dallas County, Texas, and appellant Walter Grabes filed a plea of privilege to be sued in Harris County, Texas. Appellee duly controverted the pleas on various statutory grounds. The trial court, after hearing the evidence, overruled the pleas, and appellants have appealed.

Among the statutory exceptions relied upon by appellee to sustain venue in Bowie County, Texas, is subdivision 9 of Article 1995, Vernon's Ann.Civ.St. Plaintiff pleaded and proved that appellants committed a trespass in Bowie County, Texas, by converting personal property situated in Bowie County, Texas, and removing said property from said County without the consent of plaintiff, in which property the plaintiff had a sufficient property interest and right of possession to support an action for conversion.

Thelma Grabes and Walter Grabes were married in 1948 in California and were divorced in 1954 in Nevada; as hereinafter related there was evidence in the record that they later lived together and conducted themselves in such manner as to raise the issue that they were common law man and wife; there was also evidence in the record to the effect that they were transient persons and non-residents of Texas.

The plaintiff, Ethel O. Fawcett, who resided in Texarkana, Arkansas, testified to the effect: That defendant Thelma Grabes was a third or fourth cousin of hers and that for a period of about a year prior to the transaction in question, Walter Grabes and Thelma Grabes, who held themselves out to Mrs. Fawcett (and to others) as man and wife, began a course of visiting her home, phoning her (but never writing letters), and frequently spent the night in her home, occupying the same room and the same bed; that they each drove new Cadillac automobiles and represented themselves as being very wealthy and wanted Mrs. Fawcett to go into business with them, representing to her that they would sell her a half interest in some machinery for $25,000; that they would transport the machinery to Texarkana, Texas, and open up a factory, that they would assure her that the factory would pay 15% profits within six months and close to 50% profits or more annually in the next two years; that Walter Grabes represented to her that if she got dissatisfied that he would pay her back and said, "I have the money. It will be her business and yours. I will work for two women instead of one;" that on December 28, 1956, a written agreement (which is found in the record) was entered into for Mrs. Fawcett to purchase a half interest in the listed machinery from Thelma Grabes for the sum of $25,000, with the machinery to be moved to Texarkana; which agreement was witnessed by Walter Grabes and another person; and that Walter and Thelma Grabes demanded that she sign the agreement and get the money. We quote from Mrs. Fawcett's testimony in this connection as follows:

"A. * * * Thursday after Christmas Thelma and Walter followed behind me and demanded the money. And they said, 'Tell me where your typewriter is.' And I said, 'Over there.' And they listed the equipment and were going to sell me half of it for $25,000.00. I said that I didn't have it. I signed it and she signed it. I didn't think any more about it. I didn't have the money. He said, 'Ethel, I have to move that stuff by the first of January.' I said, 'Walter, I don't have the money and I can't go on a new venture.' They said, 'You get some together and we will be back.' They went to Houston. They were constantly on the road or calling me. After they got my money, they were not the same people any more.

"Q. What did they say about opening a place after they got your money?

A. They got to talking about the town. It was lousy—nobody here. It was the commonest place in the world. They went to condemning me and everybody in Texarkana. They went to drinking heavy.

"Q. You say they did occupy the same room together? A. Yes. When I was crowded during Christmas, they occupied one of my apartments and it only had one bed, and they occupied it, and one time they occupied a garage apartment with one bed, and they occupied it.

"Q. When you paid them this $19,-965.00, I will ask you whether or not you had been to the cafeteria on that occasion? A. Yes, we had just been to one, but this was at my house. With what I had borrowed, I had $20,000.00, but I had a grandson in the University that I had to send $35.00, and that left it $35.00 short of $20,000.00, and Walter said that was all right, and Thelma said when she was on the stand that she had asked me for the rest of it but to this day, they have not asked me for another dime.

"Q. Did she ask you that day? A. No.

\* \* \* \* \* \*

"Q. Do you have the original receipt, Mrs. Fawcett? A. He has the receipt. At no time did they ever ask me for any more. *They said when we got it up and started that would be soon enough.*

\* \* \* \* \* \*

"A. I had two weeks for them to keep wanting me to get it up, and I finally got enough together to satisfy them, *and he said I wouldn't have to pay the rest until he got it set up in operation.*" (Emphasis added.)

The evidence further shows that Mrs. Fawcett paid $19,965 on January 15, 1957, and was given a receipt. We quote further

from her testimony with reference to this receipt as follows:

"Q. Mrs. Fawcett, this receipt here reads, 'Received $19,965.00 (Nineteen Thousand Nine Hundred Sixty Five and 00/100 Dollars toward one half interest on machinery as per agreement December 28, 1956.' *They accepted that $19,965.00 as part interest in that machinery, did they not?* A. *That's right.* (Emphasis added.)

"Q. Now, they took this stuff without your consent and over your protest out of Bowie County, did they not? A. Yes.

"Q. You have sued in here and say if you are not entitled to your money back, you are entitled to your interest in that machinery? A. Yes.

"Q. And you ask that the machinery be partitioned and divided? A. Yes."

The evidence further shows that following the payment of the $19,965 appellants did move a load of machinery to Texarkana, Texas, and placed the same in a building at Spring Lake Park owned by the Four States Fair Association and located in Bowie County, Texas. It is also a rather clear inference from the evidence adduced that appellants made no serious efforts to open a factory in Texarkana, Texas, and really had no good faith intentions of opening up a factory. Mrs. Fawcett testified to the effect that as soon as the Grabes got her money their attitude changed drastically and she asked to get her money back and that they promised to give her money back to her, but did not do so. She further testified that on February 18, 1957, the Grabes (after the lock was broken on the building where the machinery was stored) caused the machinery to be loaded on trucks over her protest and without her consent. That on the morning of February 18, 1957, Mr. and Mrs. Grabes were at the building in Bowie County, Texas, where the machinery in question was be-

ing loaded and Mrs. Grabes when told by Mrs. Fawcett not to move the machinery until she could get back out there said, "You come back. It will take to 3:00 or 4:00 to get this stuff loaded." Mrs. Fawcett further testified that on February 18, 1957, she forbade Mr. and Mrs. Grabes to move the machinery, asked Mrs. Grabes where she was going to move the property and that Mrs. Grabes testified that she did not know and might not move it out of Bowie County, Texas, but that after a while Mrs. Fawcett was informed by the truck driver that he was going to take the property to Dallas. Mrs. Fawcett testified that she had her attorney to begin preparing papers for a suit and testified:

"Q. I will ask you whether or not you sued out a writ of injunction *before they moved that?* A. *That's right.*

"Q. Was the sheriff able to catch them? A. No, they got away from the county.

"Q. Then you caused the writ of attachment to issue? A. That's right.

"Q. And had it served in Dallas, Texas? A. Yes.

"Q. They have never paid you any of that money back, have they? A. No.

"Q. And you have not released your interest in that machinery? A. No.

"Q. This was in Bowie County that they refused to tell you where they were taking it? A. Yes.

"Q. It was in Bowie County that you told them not to move the machinery? A. Yes.

"Q. Did they move it over your protest? A. That's right." (Emphases added.)

There was testimony in the record to the effect that the truck which went to Dallas left the Fairgrounds building Tex-

arkana, Texas, about 2:00 p. m. The record is silent, however, as to whether the truck proceeded to Dallas immediately without making any further stops in Bowie County. Texarkana, Texas, is on the East boundary line of Bowie County and there is a considerable distance from the East boundary of Bowie County to the West boundary of Bowie County. Dallas is West and South from Bowie County. Papers in the suit were prepared and the District Judge of Bowie County, Texas, 5th Judicial District of Texas, at 3:40 p. m. on February 18, 1957, granted a temporary restraining order restraining the defendants from moving the property in question out of Bowie County, Texas, and the file mark on plaintiff's original petition shows that it was filed with the District Clerk of Bowie County, Texas, at 3:45 p. m., February 18, 1957. The record is silent as to whether the truck in question had gotten out of Bowie County, Texas, by 3:45 p. m., February 18, 1957. The evidence does show that the truck was on the East boundary of Bowie County at 2:00 p. m. on February 18, 1957. The evidence does not show when the truck reached Dallas, however the machinery which went by truck to Dallas was attached in Dallas County, Texas, on February 20, 1957, and the two defendants, Thelma Grabes and Walter Grabes were served with personal citation in Dallas County, Texas, February 20, 1957.

The evidence further shows that another part of the machinery in question was loaded at Spring Lake Park (in Bowie County, Texas) in the truck of Royce E. Nix of Texarkana at the direction of Mr. and Mrs. Grabes, Mr. Nix testified that he was employed by Mr. Grabes, and that both Mr. and Mrs. Grabes instructed him to store such machinery for them at his storage yard in Texarkana which he did. He further testified that he left his storage yard about 12:30 and went to Spring Lake Park and that he loaded part of the machinery on his truck and that "We got back to our yard *about 3:30.*" The evidence does not disclose affirmatively whether the location of Mr.

Nix's storage yard was located in Bowie County, Texas, or not.

■ It is well settled law in Texas that a conversion of personal property amounts to a trespass as contemplated by subdivision 9 of Article 1995, V.A.C.S. Friemel v. Crouch, Tex.Civ.App., 189 S.W.2d 764; Commercial Credit Corp. v. Harris, Tex. Civ.App., 225 S.W.2d 247. Also see authorities cited in 42 Tex.Jur. p. 546.

■ It is also well-settled law in Texas that a suit for conversion may be maintained by one tenant in common against another tenant in common who appropriates to his own use and benefit the entire property owned in common between them. See Friemel v. Crouch, Tex.Civ.App., 189 S.W. 2d 764, and authorities cited therein.

■ Appellants argue to the effect that appellee Mrs. Fawcett did not have a sufficient property interest and right of possession to a portion of the machinery in question so as to entitle her to maintain a suit for conversion under the facts in this case. In the recent case of Hart (McFarland) v. Meadows, Tex.Civ.App., 302 S.W. 2d 448, 450, er. ref., n. r. e., it was stated in the opinion by Chief Justice Chadick as follows:

"Besides asserting there that there is no pleading and no evidence, or at least insufficient evidence to support the judgment, the appellants' points are directed at the proposition that the judgment was erroneous because the plaintiff did not have an interest in and right of possession to the personalty sufficient to maintain an action for its conversion.

"To determine this question, it should be kept in mind that the reassignment and reconveyance provision of the contract (Meadows to Wimberly assignment) is an agreement to convey a title to an interest in real property as well as title to personal property. Both are a part of a single contract and both are inseparably interwoven in the transaction. It is not possible to determine from the contract what the worth of the lease is separated from the worth of the personal property or how much of the $20,000 reserve payment was meant for the lease and how much for the machinery, etc. In Amsler v. Cavitt, Tex.Civ.App., 210 S.W. 766, wr. ref., it was held that the remedy of specific performance was available to require the performance of a contract where both the realty and personalty were the subject of the contract. In Citizens' Water Co., v. McGinley, Tex.Civ.App., 175 S.W. 457, no writ history, there was an agreement to reconvey land if a water well was not drilled. "On failure to drill, it was said that this provision, if regarded as a condition subsequent, was breached, and the court held the grantor might make re-entry and revoke the grant. Or if the provision was considered as an agreement to reconvey upon certain contingencies (if a condition subsequent and an agreement to reconvey upon contingencies may be differentiated) then the grantor or his assigns would have a right to enforce the contract to reconvey by specific performance. In addition to the reasoning and the authority inherent in the cases mentioned, in determining the nature of the property and possessory right of the plaintiff reliance also may be had upon the equitable maxim that equity regards that as done which ought to have been done. Surely, it would not be argued that the plaintiff below could not have properly filed an appropriate equitable action compelling the reassignment of title to the real and personal property when Mid-Gulf failed to continue production operations. Mid-Gulf having breached its obligation and failed to reconvey title, a court of equity would have compelled by specific performance a reassignment of the lease and delivery of title and possession of the machinery, etc.

"While the term 'equitable title' is generally associated with a title to real property, there appears to be no sound reason why a property right and ownership in personal property might not be so described. In Henshaw v. Texas Natural Resources Foundation, Tex. Civ.App., 212 S.W.2d 241, 242, wr. ref., n. r. e., a case concerned with land, it is said: 'An equitable title in Texas has been defined as "the present right to the legal title." ' By analogy it can be said that the interest of the Meadows estate in the personalty was a present right to the legal title and possession of the machinery, etc., in the nature of an equitable title.

"Consideration of the foregoing authorities and reasoning results in the conclusion that plaintiff in this suit had a sufficient property interest and right of possession in the machinery, equipment and supplies to support an action for conversion. In 42 Tex.Jur., p. 530, Sec. 21, on the basis of authorities cited in the footnotes, it is stated:

" 'In some of the cases it is simply said that in order to maintain trover a plaintiff must have had some right or title to the chattel in question at the time of the alleged conversion. In other decisions it is declared that the plaintiff must have had either a general or special ownership and, in addition, either possession or the right to immediate possession of the property in question.'

and at page 533, Sec. 23, considering interests in personalty somewhat different but of lesser title and right of possession than shown here, it is said:

" 'It is well settled that a chattel mortgagee, pledgee, landlord, or other lienholder may sue for a conversion of the encumbered property and recover its value to the extent of his lien, though he was not entitled to the possession at the time of the conversion.'

"Having concluded that the action for conversion was a proper remedy the appellants', Hart and McFarland's points of error do not show merit and are respectfully overruled. The evidence is sufficient to support the judgment under the pleading and proof."

We hold that under the evidence in this case appellee had a sufficient property interest and right of possession in the machinery in question to maintain the action for conversion.

■ We also hold that the evidence is sufficient to show that both Thelma and Walter Grabes actively participated in the conversion and are suable jointly for the conversion, irrespective of whether they were common law man and wife.

We are also inclined to the view that the evidence as shown in the record was sufficient to sustain an implied finding by the trial judge to the effect that Thelma Grabes and Walter Grabes were common law husband and wife. Clark, Venue in Civil Actions in Texas, p. 21; Wingfield v. Pool, Tex.Civ.App., 38 S.W.2d 422, and authorities cited therein.

■ We hold that venue in this case under this record was clearly sustainable in Bowie County, Texas, against both appellants, Walter Grabes and Thelma Grabes, under subdivision 9 of Article 1995, V.A. C.S.

We are inclined to the further view that under the peculiar and unusual facts in this case, the evidence was probably sufficient to support an implied finding by the trial court to the effect that the machinery in question, or a part of it, was located in Bowie County, Texas, at the time the suit was filed, so as to sustain venue in Bowie County, Texas, under subdivision 10 of Article 1995, V.A.C.S., which provides in part as follows: "Suit for the recovery of personal property may be brought in any county where the property may be. * * *"

We sustain venue in Bowie County, Texas, in this case, primarily under subdivision 9 of Article 1995, V.A.C.S. We are of the further view that under this record venue in Bowie County is also probably sustainable under subdivision 10 of Article 1995, V.A.C.S. We deem it unnecessary to discuss the other grounds relied upon by appellee to sustain venue in Bowie County, Texas.

The judgment of the trial court is affirmed.