Bryan W. FORISTER, Jr., et al., Appellants,

v.

W. R. COLEMAN et al., Appellees.

No. 11515.

Court of Civil Appeals of Texas.

Austin.

June 21, 1967.

Rehearing Denied Sept. 13, 1967.

Leonard L. Franklin, J. Malcolm Robinson, Austin, for appellants.

Holloway & Holloway, Sterling Holloway, James R. Sloan, Austin, for appellees.

HUGHES, Associate Justice.

Dr. Bryan W. Forister, Jr., Ivan M. Stout and John E. Shelton, Jr., appellants, and others brought this suit against W. R. Coleman and Sterling Holloway, appellees, alleging that they and others own and are entitled to certain rights and interests in and pertaining to Lots 1 and 2, Block 2, Emmett Shelton Subdivision, Wilkenson-Sparks Survey No. 4, Travis County, Texas. These rights and interests are claimed under and through Emmett Shelton, the common source of title of all parties to this suit.

The rights and interests of appellants in this property are based upon the deeds of Emmett Shelton as well as representations made by him prior to the execution of certain of the deeds upon or under which appellants claim.

The trial court disposed of the major contentions made by appellants by granting appellees' motion for summary judgment. Minor and subordinate matters were decided by the court without a jury.

We will state the case as reflected by the record in a manner most favorable to appellants insofar as the summary judgment against them is concerned.

The property in controversy is approximately 1½ acres in size (160 feet wide by 420 feet long) located on Bee Creek in the City of Westlake Hills, a suburb to the west of Austin, Texas. Its border to the north is Bee Creek; to the west by the property of Arlyn Smith; to the east by the property of A. S. Hull; and, to the south by a public road, Westlake Drive.

It was originally a part of a 200 acre tract acquired by Emmett Shelton from the Minnie Stroter heirs in 1940.

In 1940, when Emmett Shelton began selling parts of the Stroter land previously acquired by him he made representations to purchasers as shown below:

"Our names are Lady Grace Snow Toole and Marion Toole; we are husband and wife, over 21 years of age and have never been convicted of a felony or a misdemeanor involving moral turpitude, and we each have personal knowledge of the following facts which are given in connection with the above law suit and in connection with the controversy over that tract of land lying between Westlake Drive and Bee Creek which is generally described as Lots 1 and 2, Block 2, Emmett Shelton Subdivision.

During the summer of 1940, we conducted a diligent search for property located in the Highland Lakes area not too far distant from Austin that would afford access to Lake Austin. We saw an ad advertising property located on Westlake Drive and which we think stated with park area access and boat dock frontage on Bee Creek of Lake Austin. A salesman, whose name we cannot remember but who worked for Henry Wendlandt or in association with Henry Wendlandt, was contacted and we were shown the property by him. We were not married at this time but were planning on being married and were married several months later, and we were both present and after being shown the upper lot or No. 9, Block 4, we were then driven into the park area which was Lots 1 and 2, Block 2, and shown this area and the stone wall erected along the shore of Bee Creek where boat dock spaces were provided for the lot owners.

The park had an oval drive around the inside of the two lots with parking and picnic area provided between the oval drive. We were told by this salesman that the purchasers of the lots being sold out of the Wilkenson-Sparks Survey would be entitled to the use of this park area to drive from the lots above and park their cars while boating and that they also could use the area for picnicing. It was purely on the strength of this feature that Lot No. 9, consisting of 2.18 acres, was purchased by us in Miss Snow's name. Since the deed itself to the above lot didn't specify that the park area and boat dockage space was part of the deal, we requested a letter from Mr. Emmett Shelton, and Mr. Shelton did comply with the request and provided a letter dated September 20, 1940, stating that the park area and boat docks would be provided for use then and for use in the future by the lot purchasers. At the time of the sale of this property to Dr. and Mrs. Bryan W. Forister, Jr., we stipulated to Mr. Emmett Shelton, Jr., the real estate agent, and instructed him that the boat dock space and share in the park area composed of Lots 1 and 2, Block 2, granted to us were to be transferred to the Foristers as part of the sale of our Lot No. 9, Block 4, consisting of 2.18 acres of land."

We quote the following from the letter referred to by Mrs. Toole from Emmett Shelton dated September 20, 1940:

"You will also have your choice of a ten foot space on the park which we have set aside out of the Lots Nos. 1 and 2, in Block No. 2, of this subdivision, and you will be given a deed to this along with the other purchasers in our addition when the balance of said lots have

been sold. However, you may choose your space on the creek at any time you wish and make use of the park from now on."

We quote from the affidavit of Rufus G. King:

"During the month of September, 1938, I purchased some mountain property located in the Wilkenson-Sparks Survey in Travis County, Texas, from Mr. Emmett Shelton. At the time of the purchase, Mr. Shelton told me that for all those who purchased off-the-lake property from him he was conveying to each of such persons 10 feet of land bordering the water's edge of Bee Creek. These strips of land to cover only a one foot wide area of land bordering the water's edge of Bee Creek, together with the use of the land under the waters of Bee Creek that lie directly north of each space. In addition, he stated that the parties would have the complete use of his lands that lie behind these one foot strips as a park.

Attached hereto is a Xerox copy of a letter, the original of which is in my possession, which I received from Emmett Shelton stating that he was building a rock wall along the 10 foot strips along the water's edge and refers to this area as a park.

Also attached to this affidavit is a Xerox copy of a letter dated January 17, 1940, which I received from Emmett Shelton, the original of which is in my possession acknowledging the receipt of the money asked for in the first letter for improving the dock site on the 'park reservation.' At the time I purchased my property from Mr. Shelton, it was by understanding, from statements made to me by Mr. Shelton, that the tract of land located directly back of the waterfront strip, and between the property of A. S. Hull and Arlyn Smith, and extending to the present Westlake Drive, was to be used exclusively as a park and picnic area by the owners of the above mentioned 10 foot strips of land along Bee Creek."

We quote from the letter referred to by Mr. King from Emmett Shelton dated January 11, 1940:

"We are starting in this week to build a stone and cedar dock around the park on which you have a ten foot front along the water's edge. We have approximately 300 feet on this park which must be either fixed within the next two weeks or it will be impossible to have anything but a dirt landing later. We have sold only about five cites off of the lake front at this time and we have estimated that it will cost approximately $15.00 for each ten foot space to build a rock foundation and set large cedar posts into the same, which will stick above the water's edge. I am writing each of the parties who have an interest in this park to find out if they wish to fix their ten foot front along this uniform pattern, as we intend to dress the balance up this way and add the cost to the price of the cites which we later sell."

We quote from the affidavit of Ivan M. Stout:

"The property upon which I live is just west and approximately 500 to 600 feet from the property in controversy and is shown on the official map of the City of Westlake Hills bearing my name and bounded on the northeast by Westlake Drive; and on the south by Shelton Road.

This property was purchased in 1955 from Dr. C. M. Cleveland and Mrs. C. M. Cleveland. * * *

(d) Upon returning to the point from which the boundary inspection was started, Dr. Cleveland told us for the first time that there was a piece of lake property that was part of the transaction, and that he must also show it to us.

(e) We all three went down the hill a few hundred feet toward Austin and entered the property on foot Dr. Cleveland explained that this tract of land had been set aside for the use of some 15 property owners who had bought land from Emmett Shelton, but who did not otherwise get access to the lake. He stated that the property was about 150 feet wide between the wire fences and, in effect, 'You can use this property to picnic on but you can't build anything up here' and further explained that access to the lake could be had across the entire property. He also explained that each of the 15 participants in the overall easement were to receive deeds to 10 foot wide tracts of lake frontage. It was stated that those deeds were to come from Mr. Shelton, but that he had 'been slow' in executing these deeds. * * *

Concerning the use of the property (in suit) by the owners, and for the purposes intended; there was never a doubt. We entered the property when we wished, parked where we wanted to or could find a spot not in use. If some one who was not a property owner came in we explained that this is private property and asked them to leave. I have been over the entire tract except for the extreme northwest corner which was covered with boulders and brush. Most of this has now been pushed down toward Bee Creek. My sons made constant use of the property, taking friends there for boating and swimming. There was never a single instance where anybody challenged any of our rights. By word from Dr. Cleveland, by written document that speaks for itself and by more that 10 years' practice we have enjoyed unrestricted passage over the entire tract of land between the Smith-Hull fences."

We quote from the affidavit of Dr. C. M. Cleveland:

"Some time in the 1940's, Mrs. Cleveland and I purchased from Mr. Emmett Shelton a lot with frontage on Little Bee Creek and on which we built a cabin. A little later we purchased a second lot from the same Mr. Emmett Shelton which had frontage on Westlake Drive but did not have any waterfront frontage on Little Bee Creek. Later we purchased a third lot adjacent to the second lot which we had purchased which also had no lake frontage. This lot had been sold by Mr. Shelton prior to our purchase.

In purchasing the lots 2 and 3 described above, Mr. Emmett Shelton stated to me personally and to my wife on several occasions that these lots, together with other lots originally owned by him and which had no lake frontage, would enjoy the following lake privileges:

(a) The area of ground bounded by lots owned by Mr. Arlyn Smith and Mr. Hull and by Little Bee Creek and by Westlake Drive had been set aside permanently for a park for people who had bought or would later buy from him and who had no access to the lake.

(b) Furthermore, to each of these lots would go a deed to a certain frontage on Little Bee Creek for the purpose of providing boat facilities to the corresponding property owners.

(c) The permanent park so set aside was to serve as an access area for the property owners to the certain boating facilities and was to be common to all persons who bought tracts from Mr. Emmett Shelton who had no water frontage.

Later on, Mrs. Cleveland and myself sold the lots 2 and 3 described above, which had no water frontage to Mr. Ivan Stout and we personally walked over the lots and then we personally took him down and showed him the area set aside for a park and also the area set aside for the boat dockage.

These representations made to me by Mr. Emmett Shelton added materially to

the value of the lots which I purchased from him, and I relied upon these representations as being true and correct and consequently I represented these facts to Mr. Stout when he bought the property from me."

We also quote from the affidavit of appellant Dr. Bryan W. Forister, Jr.:

"In the months of August and October of the year 1963, my wife and I purchased for the approximate sum of $19,000.00 two tracts of land, the first being 3.1 acres from Henry Wendlandt, Jr., and the second being 2.18 acres from Lady Grace Snow and Marion Toole.

These tracts of land are adjacent to one another and located in the Emmett Shelton Subdivision of the Wilkenson-Sparks Survey, fronting approximately 1,000 feet along the west and south side of Westlake Drive and across Westlake Drive from the property of A. S. Hull and Arlyn Smith and the Lots 1 and 2, Block 2, Emmett Shelton Subdivision, which is the subject of this controversy.

Prior to the time of our first purchase of the 3.1 acre tract from Mr. Henry Wendlandt, Jr., Mr. Wendlandt showed us the property and then took us to the waterfront property on Bee Creek and across the property in controversy and told us that this area between the two fences had been set aside by Emmett Shelton, the original subdivider of this property, for all the people in the subdivision whose property did not have waterfront privileges; and, that the same Emmett Shelton had given an easement across the property fence to fence and given an outright deed to a one foot strip of land along the water's edge for the purpose of building boat docks. Mr. Wendlandt then showed me the boat house which he had built on his one foot strip and told me that this boat house, the property on which it was built and the area in back for parking and a recreational area was all included in the purchase price of the 3.1 acre tract.

At the time of purchase of this first piece of property from Mr. Wendlandt in August, 1963, I bought a boat, put it in the boat house on Bee Creek and my family and friends have used this waterfront property continuously since then for boating, fishing and recreation. The property in controversy, or Lots 1 and 2, at that time had a road entering from Westlake Drive approximately 20 feet in width running about 6 feet from the fence along the southeast most boundary to approximately 40 or 50 feet of the water's edge and approximately 100 feet from the southeast boundary a turnaround area had been made and then further back on the lot approximately in the middle of the property there were other parking and drive areas which consumed approximately the southeast half of said area. In addition, there was a drive onto the area from Westlake Drive approximately two-thirds of the way up on the property and 66 to 70 feet in length. These measurements were made by me with a steel tape and although I realize they are not exact they are fairly accurate.

I first met the defendants, W. R. Coleman and Sterling Holloway, in July of 1963 when Mr. Wendlandt was showing me the waterfront property. Both Mr. Coleman and Mr. Holloway were down by the water and after being introduced by Mr. Wendlandt, Mr. Coleman said he and Mr. Holloway were planning to get all of the property owners together to form a Bee Creek Club and improve the property and build boat docks along the waterfront for everyone. Mr. Coleman stated that it was necessary for everyone to get together to build anything on the property. I said that this was perfectly agreeable to me and that I would do anything that I could to help and suggested them building part of their docks on the side of my boat house.

Thereafter and while still trying to decide whether or not to invest in our permanent home on this Wendlandt property,

my wife and I became very good friends with W. R. Coleman and his wife. I discussed this problem many times with Mr. Coleman and I was concerned with the building restrictions and what might eventually become of Westlake Hills as a residential section. It was largely due to the encouragement and discussion with Mr. Coleman that my wife and I finally decided to build on the Wendlandt tract.

To further insure our privacy and an additional grant of land on the waterfront, I bought the adjoining 2.18 acre tract from Lady Grace and Marion Toole in November of 1963. Mr. Emmett Shelton, Jr., represented Mr. and Mrs. Toole as their real estate agent in this sale. He stated to me that the property behind the waterfront docks on Bee Creek was for the use of all those persons who owned waterfront property and that nothing would ever be built thereon.

Shortly after buying the Toole tract, Mr. Coleman asked me to sell the 10 foot strip of land that went with it on Bee Creek because his 10 foot strip was over on Mr. A. S. Hull's property and he couldn't build any boat docks on it. I explained to him that the land on the water's edge was assignable only in connection with the main tract of land; however, that he didn't need any assignment from me because he could go ahead and build a boat dock on it anyway.

Thereafter in late November, 1963, we began our house plans with Mr. Coleman as the designer. The construction was begun in March, 1964, and we moved into our new home in November, 1964. The home itself cost approximately $55,000.00 to construct. Consequently, the $55,000.00 and the $19,000.00 for the land represents an approximate $74,000.00 investment which I have across the road from the property in question."

Similar affidavits are in the record from Mrs. Lois Gibson, Mrs. Virginia Leberman and Miss Frances Poole, all original purchasers from Emmett Shelton.

Also, there are in the record affidavits of similar import from Henry Wendlandt, Jr., John E. Shelton, Jr., and Miss Ann Holmes who were in privity of estate with Mr. Emmett Shelton.

On November 30, 1955, Emmett Shelton conveyed by general warranty deed fifteen tracts out of Lots 1 and 2, in controversy, to Emmett Shelton, Jr., Henry Wendlandt, Jr., Rufus King, Van M. Kennedy, Stuart MacCorkle, Lady Grace Snow, Ivan M. Stout, Mrs. Virginia Leberman, Frances Poole, Edna West, Temple Phinney, Sterling Holloway and Lois M. Gibson. These tracts were all one foot wide and ten feet long, except three tracts which were twenty feet long, and they lay lengthwise at the water's edge of Bee Creek. We quote from this deed:

"This grant is specifically understood to cover only a one-foot strip of land bordering the water's edge, together with the use of the land under the waters of Bee Creek that lies directly north of each space which may be used for the purpose of boat dockage. Each grantee in this deed is given the additional right of ingress and egress over the lands of grantor that lie between the property of Arlyn Smith and A. S. Hull, to the above described spaces and/or tracts. Each grantee is given the right to use the walk-way immediately south of the grants herein made for purposes of access to the various tracts, provided that no obstructions are placed upon said walk-way that would prevent the free use of such walk-way by any and all of the grantees herein mentioned.

It is expressly understood and agreed by the grantees herein that these grants are made in connection with the purchase of other lands from the grantor, which other lands do not have frontage on the waters of Lake Austin. This grant is made for the purpose of permitting the owners of such other lands do have access to Lake Austin. The privileges herein granted shall pass from the grantees

herein to the purchasers of such other grants of land whether mention is made in such conveyances or not; it being specifically understood by the grantees herein that the privileges mentioned herein are not personal to the grantees, nor are they assignable except in connection with the title to such other lands.

The intent of this conveyance is to make water front privileges available to the owners of land in the Sparks and Chambers Surveys, who have purchased such lands from the grantor."

A one half interest in Lots 1 and 2, except the strips conveyed as above stated, were conveyed by Emmett Shelton to Bee Creek Club, Inc., a nonprofit corporation, in 1963, without consideration. In 1964, the club conveyed this one half interest to William Coleman, Trustee for himself and Sterling Holloway. In 1964, Mrs. Elba May Shelton, former wife of Emmett Shelton, conveyed to Sterling Holloway a one half interest in these lots subject to the rights of the strip owners for which she received $1,000.00. Mr. Emmett Shelton, about this time, was paid $1,000.00, presumably by appellees, for the one half interest previously conveyed by him to the club.

The trial court, as reflected by his judgment, concluded that appellees' motion for a summary judgment should be sustained except fact issues as to whether the plat of the Holloway-Coleman Subdivision of Lots 1 and 2, filed of record, cast a cloud on the title of appellants under the 1955 Emmett Shelton deed and as to whether contemplated improvements by appellees upon these lots would interfere with the rights of ingress and egress held by appellants under such deed. These fact issues were submitted to the court for decision.

The trial court expressly held, "that no basis exists for varying, altering, or changing the express terms and legal effect" of the 1955 deed from Emmett Shelton to appellants or their predecessor in title. The trial court rendered judgment, the material portion of which, we quote:

"(2) That the Defendants Sterling Holloway and W. R. Coleman are hereby adjudged to be the owners in fee simple of the land in the Wilkenson-Sparks Survey, in Travis County, Texas, particularly described in a deed from Emmett Shelton, Sr., to Bee Creek Club, Inc., dated May 28, 1962, recorded in Volume 2607, Page 533, Travis County Deed Records, which land extends between its lateral boundary lines from West Lake Drive to within one foot of the waters of Bee Creek, an arm of Lake Austin, save, except, and subject to the easements across said land granted by the Shelton Deed of March 30, 1955, recorded in Volume 1564, Page 430, Travis County Deed Records;

(3) By the terms of said Deed of March 30, 1955, the Grantees therein, and their successors in title, including the Plaintiffs herein, acquired the following, and only the following rights, titles, and interests:

(a) Title to the respective one-foot strips of land along the water's edge of Bee Creek, as located on March 30, 1955, extending one foot in depth from said water's edge and along the water's edge, in some instances ten feet in length, and in some instances twenty feet in length, as specified in said Deed;

(b) The right to use the waters of Bee Creek in front of said strips for boat dockage and recreational purposes;

(c) An easement for ingress and egress across and along the walkway along and immediately back of such individually owned strips, for access to the individual strips; and

(d) An easement for reasonable ingress and egress across the land of the Defendants described in Paragraph (2) above from Westlake Drive, for access to the walkway and by means thereof to

their respective one-foot strips along the waterfront of Bee Creek.

(4) That a strip thirty (30') feet in width along the East property line of Defendants' property running from the public road to the one-foot strips adjacent to the water's edge is sufficient to provide the easement of ingress and egress referred to in Sub-Paragraph (d) above, and a walkway six (6') feet in width running therefrom in a Westerly direction immediately adjacent to the one-foot strips and on the South side thereof and running to the West Boundary Line of Defendants' property is sufficient to provide the walkway described in Sub-Paragraph (c), above.

(5) That no acts of the Defendants have abridged, denied, or infringed said rights of the owners of said strips, as above set forth; that the Plat of the Holloway-Coleman Subdivision filed by Defendants does not interfere with said rights nor cast any cloud thereon, but expressly recognizes such rights; and that the easement rights set out in Paragraph 4, above, are sufficient to provide adequate and reasonable means of ingress and egress to Plaintiffs, and other owners of waterfront strips for access to said waterfront strips; that in the exercise by Plaintiffs, and other owners of such strips, of the right of access thereto they are and shall be under a duty to exercise such rights in a manner that will be as little burdensome and interfere as little as is reasonably possible with the use by Defendants, as fee owners, of the land and property owned by them; and it is further expressly adjudged that the Plaintiffs have no rights to the use of any part of the lots shown on said Holloway-Coleman Subdivision Plat, or to interfere with the unrestricted use by Defendants of said lots, or with their access thereto, reasonable means of access to the waterfront strips being available to Plaintiffs outside the boundaries of said lots as shown on said Plat."

Before considering appellants' brief, we turn to a counterpoint made by appellees to the effect that appellants have no standing to maintain this suit.

This point, as to Dr. Forister and Mr. Stout is based upon the fact that neither of these gentlemen bought directly from Mr. Shelton. Emmett Shelton sold lots to Dr. Cleveland who in turn sold to Mr. Stout, who was also a grantee in the 1955 deed from Mr. Shelton. Emmett Shelton sold lots to Mr. and Mrs. Toole and to Mr. Henry Wendlandt who sold them to Dr. Forister.

John E. Shelton, Jr. is a grantee in the 1955 deed from Emmett Shelton, the construction of which is here involved.

Appellees cite to sustain their position: Gehl Brothers Manufacturing Co. v. Price's Producers, Inc., 319 S.W.2d 955, Tex.Civ. App., El Paso, n.w.h.; Citizens Real Estate and Mortgage Co. Inc. v. Sharp, 246 S.W. 2d 698, Tex.Civ.App., Texarkana, n.w.h., Hardin Lumber Co. v. Shepherd, 40 S.W. 2d 215, Tex.Civ.App., Galveston, writ dismissed; Dallas Power and Light Company v. Carrington, 245 S.W. 1046, Tex.Civ. App., Dallas, writ dismissed; and Lakewood Heights Co. v. McCuistion, 226 S.W. 1109, Tex.Civ.App., Dallas, writ ref.

The first four cases cited are inapplicable since they are privity of contract cases.

The last case cited, Lakewood, held that an agreement between a vendor and vendee of land but collateral to the deed of conveyance whereby the vendor agreed to furnish electricity, gas, water, sewers, and street car service did not inure to the benefit of assigns of the vendee because such an agreement was not a covenant running with the land.

The last case points up the problem presented here, as it relates to the representations made by Emmett Shelton to purchasers of lots from him. If they were of such nature as to constitute covenants running with the land then they inure to the benefit

of subsequent owners of the land under the doctrine of privity in estate which is stated as follows in 72 C.J.S. Privity p. 961:

> "Privies in estate strictly mean only those between whom there are certain rights and relations resulting from the estate held, and not from contract between them, and privity in estate arises only between mutual or successive holders of title to the same right or interest in the same property, and it denotes mutual or successive relationship as to rights, mutual or successive relation to the same right of property, identity of title to an estate; * * *."

In a footnote to this quotation there appears the following summation of the decision in Bailey v. Stedronsky, 57 Ohio App. 265, 13 N.E.2d 588:

> "When the term 'privity' is considered with respect to its relationship to estates in realty, it must be understood that it implies succession, that is, successive ownership or possession of the identical estate in the same property, and one who is in privity with another with respect to an estate stands in exactly the same position with respect thereto as did his predecessor in title; he takes the estate with all the burdens and benefits attending it."

■ Appellants were in privity in estate with Emmett Shelton. John E. Shelton was also in privity of contract with Emmett Shelton.

We therefore, hold that appellants were entitled to maintain this suit.

Appellants' first point of error, subdivided into nine specific points, is that material issues of fact were raised by the pleadings and evidence and the court erred in not so finding.

Appellants' pleadings were full, in that they contain allegations of fraud, mutual mistake, estoppel in pais, dedication, and trust relations to establish their claimed

rights in Lots 1 and 2. We do not analyze these pleadings because under the posture of the case it is facts, not pleadings, which are determinative. Womack v. Allstate Insurance Company, 156 Tex. 467, 296 S. W.2d 233.

■ The affidavits made by purchasers of lots from Emmett Shelton, from some of which we have quoted, are factually sufficient to raise an issue of fact on the three essential elements of estoppel in pais, i. e., representations by Emmett Shelton, purchasers' belief of such representations, and acts of reliance thereon.

Our concern is only with the legal sufficiency of the representations. Do the representations of Emmett Shelton, if established, constitute an easement appurtenant? We are of the opinion that they do.

We quote the definition of an easement appurtenant as found in 25 Am.Jur.2d, Easements and Licenses, Sec. 11, p. 425:

> "An appurtenant easement is an incorporeal right which is attached to, and belongs with, some greater or superior right—something annexed to another thing more worthy and which passes as an incident to it. It inheres in the land, concerns the premises, and pertains to its enjoyment. It is incapable of existence separate and apart from the particular land to which it is annexed.

> Two distinct tenements are involved in the case of an appurtenant easement—the dominant, to which the right belongs, and the servient, upon which the obligation rests. An easement to be appurtenant must bear some relation to the use of the dominant estate, and must agree in nature and quality with the thing to which it is claimed to be appurtenant. Moreover, such an easement can become legally attached to the dominant estate only if the same person has unity of title to both the easement and the dominant estate. It is not necessary,

however, that the servient tenement be adjacent to the dominant tenement."

The same authority, Sec. 12, defines an easement in gross as follows:

"Though it has been said that there is no such thing as an easement in gross, the courts generally recognize a distinction between those rights which are impressed on the land of one person in favor of another person and not in favor of another tract of land, and these rights are referred to as easements in gross. Thus, an easement in gross is a mere personal interest in or right to use the land of another. It is not supported by a dominant estate, but is attached to, and vested in, the person to whom it is granted. In fact, the principal distinction between an easement in gross and an easement appurtenant is that in the first there is not, and in the second there is a dominant tenement to which it is attached."

We also quote from Sec. 13 of the same text:

"Whether an easement in a given case is appurtenant or in gross depends mainly on the nature of the right and the intention of the parties creating it. If the easement is in its nature an appropriate and useful adjunct of the land conveyed, having in view the intention of the parties as to its use, and there is nothing to show that the parties intended it to be a mere personal right, it should be held to be an easement appurtenant and not an easement in gross. Easements in gross are not favored by the courts, however, and an easement will never be presumed as personal when it may fairly be construed as appurtenant to some other estate. If doubt exists as to its real nature, an easement is presumed to be appurtenant, and not in gross."

The question presented here has been recently discussed at length by our Supreme Court in Drye v. Eagle Rock Ranch, Inc.,

Tex., 364 S.W.2d 196. In that case oral representations had been made to prospective purchasers of homesites that they would have the right to use a 1000 acre ranch for pleasure and recreational purposes. The Court, in denying establishment of this easement by estoppel, made these statements:

"One other exception to the statutes requiring a writing is the doctrine of estoppel in pais. The owner of land, under some circumstances, may be estopped to deny the existence of an easement by making representations which have been acted upon by a purchaser to his detriment. * * *

The exact nature and extent of the doctrine of estoppel in pais have not been clearly defined. It has been applied in some definite categories of suits involving land. Outside of these particular groups, however, the authority for its application is rare and nebulous.

■ Most frequently the doctrine has been referred to in those cases arising out of dedication of a street, alley, or square. It is the dedication to the public which gives the rights in streets, parks, and similar areas the degree of certainty and permanency. But estoppel in pais is not dependent upon a dedication and may arise and exist independent of it. Harrison v. Boring, 44 Tex. 255, at 266 (1875); Wolf v. Brass, 72 Tex. 133, 12 S.W. 159 (1888); 3 Tiffany, Real Property (3rd ed.), 312 et seq., Easements, sec. 800. The areas of land involved in these cases, however, are generally well defined as are the servitudes sought to be imposed on them.

\* \* \* \* \* \*

The easement sought by estoppel is an easement appurtenant. Yet the rights sought have many of the characteristics of an easement in gross; i. e., privileges over the ranch which could be and were enjoyed by persons other than lot owners; privileges which were personally

enjoyable but not necessary for the use of the purchased lots. * * *

The main difficulties, however, with the lot owners' case is the nature and extent of the 'easements' claimed, their indefiniteness and enforcement of the rights claimed to have been obtained. As indicated above, easements 'for pleasure and recreation' create grave problems even when expressly granted in writing. To say the least, they were not favored at common law. First, rights to go upon land to hike, camp out, study nature and the like were classed as licenses and not interests in land. Licenses to hunt and fish are common even today. This is not to say that such an 'easement' or interest in land could not be created. But the authorities for the imposition by the courts of an easement appurtenant to land for such purposes are meager.

The privileges sought here as an easement appurtenant to land by estoppel are indefinite. The 'run of the ranch,' 1000 acres of land, contains no description of rights. Rights 'for pleasure and recreation' over such an area is likewise indefinite. Some degree of definiteness in the scope or extent of an interest is essential to its recognition as a property interest. * * *

A by-product of the indefiniteness of easements for recreation and pleasure, not contained in a writing, is the problem of their enforcement. If the court is to decree the easements, it must fix their terms and be in a position to see that they are enforced. Doing this for all of the various forms of 'recreation and pleasure' over 1000 acres of land for years to come would be difficult indeed.

▮ If the airstrip, golf course, and the like are to retain their usefulness, they must be kept in repair. This problem relates to one of the requirements for the implication of an easement: that nothing

be required of the grantor to perpetuate the easement. * * *

The alternative to the land's being kept in repair is that it simply be left vacant and unkept for the use of lot owners. There is a rather strong public policy in favor of land use rather than non-use. The policy is also in favor of the free alienation of property, particularly as the title to the property is reflected on the public records. Viewing the problem from the State as a whole, to impose indefinite servitudes for pleasure and recreation on so large an area would tend to fetter estates, retard building and improvements thereon, and hinder the use of the land."

We also quote the following from the dissenting opinion of Justice Smith in Drye, supra:

"The position of Drye et al. is simply this: That when Janes made the agreement with the initial lot purchaser or purchasers that the use of the ranch would be common to all lot owners, then Drye et al. had the right to not only establish their several individual rights to the use of the ranch, but also to establish a right, as represented to them, that the use of the ranch would be common to all lot owners. I agree with Drye et al. The rights run to each lot owner.

* * * * * *

Easements by estoppel and by dedication in the present case arise for pleasure and recreational purposes exactly in the same manner as easements by estoppel and by dedication for any other purpose, such as for streets (private or public), parks, or any other uses designated as being for the benefit of purchasers. See Wolf v. Brass, 72 Tex. 133, 12 S.W. 159. * * *

Equitable estoppel should certainly apply in the present case.

'Equitable estoppel is the effect of the voluntary conduct of a party whereby he is precluded, both in law and equity,

from asserting rights of property, contract or remedy against one who has in good faith relied upon his conduct, and by reason thereof has acquired some corresponding right of property or remedy.' Simpkins on Equity, 2nd Ed. 1911, at p. 669. Simpkins went on to say that equitable estoppel ' * * * gives triumph to right and justice when nothing else known to our jurisprudence can secure those ends.' "

Justice Smith quoted in full the opinion in McCleary v. Lourie, 80 N.H. 389, 117 A. 730, Supreme Court of New Hampshire. We quote the following from that opinion:

"SNOW, J. There being no specific grant to the plaintiffs of an easement in the grove, nor express covenant with respect to its use, the plaintiffs' interests therein, if any, under the facts in this case, must be established by way of estoppel.

■ Mrs. Thayer, plaintiffs' grantor, caused the Point to be surveyed and plotted pursuant to a purpose to develop White Birch Point as an exclusive summer colony. It is clear, from the character of such an enterprise and the location and situation of the property, as disclosed by the survey and plan, that the lake was regarded as an essential feature of the proposed development. It was the grantor's apparent purpose to utilize this feature by means of the grove adjoining the beach, which connected the water front with the system of proposed roads. The advantages of the lake, beach, and grove were accordingly stressed in elaborate advertising matter and proclaimed to patrons as inducements to the purchase of lots. Prospective purchasers were shown the plan and given to understand that the grove and beach were to be kept open for their use. The master has found that these areas were convenient and beneficial to the purchasers, that the representations were made with the intention that they should

be acted upon and that they operated as inducements to the several purchasers. Having thus induced the plaintiffs to purchase lots enhanced in value by rights in the grove and beach, the grantor and those claiming under her with knowledge are estopped to deny the existence of those rights. Walker v. [City of] Manchester, 58 N.H. 438, 441; Douglass v. Belknap Springs Land, 76 N.H. 254, 256, 81 A. 1086, 37 L.R.A.,N.S., 953."

The obstacles which the Supreme Court in Drye encountered are held insurmountable to the establishment of easements appurtenant by estoppel are not present here. The area, one thousand acres in Drye, is only one and one half acres here, its shape being 160 feet by 420 feet. In Drye, the grantor was charged with the maintenance of improvements. Here there are no improvements to maintain and the grantor, Shelton is not obligated to construct any. In Drye, the privileges sought to be established as easements appurtenant, such as "the run of the ranch, nature study, picnic, hike, ride horseback, camp out, bird watch" were held to be indefinite. Here the easements sought to be established are of a more definite character. They are primarily for the purpose of making the dominant estates, in effect, water front lots. Just as in the New Hampshire case where the lake was regarded as an essential feature of the proposed development, so here water front on Bee Creek, an outlet to Lake Austin, was, according to the evidence before us, an essential feature of the development and sale by Emmett Shelton of his property.

■ This one and one half unimproved acre with a rough terrain was pointed out by Emmett Shelton to prospective purchasers. He called it a park. But by whatever name it may be called, it was a place set aside for the permanent use of purchasers from Mr. Shelton of property in his subdivision in order that they might have access to Bee Creek and enjoy its banks for park, recreational and other incidental uses.

We consider such uses to be definite in character.

When it is considered that there are at least fourteen of these purchasers, and presumably fourteen families, having automobiles, boats, trailers and other paraphernalia, it cannot be said, as in Drye, that strong public policy in favor of land use would be violated.

But appellees say that appellants' rights, if any, by reason of the representations of Emmett Shelton, were merged in the 1955 deed from Emmett Shelton, and under which they claim.

The trial court ruled that extraneous evidence was inadmissible to vary or alter the terms of the 1955 Shelton deed, the deed being unambiguous.

■ The rule of merger and the parol evidence rule are both subject to avoidance when the defenses of fraud and mistake are properly invoked. 13 Tex.Jur.2d, Contracts, Sec. 276, p. 509. See Distributors Investment Co. v. Patton, 130 Tex. 449, 110 S.W.2d 47, and Dallas Farm Machinery Company v. Reaves, 158 Tex. 1, 307 S.W.2d 233.

Fraud and mistake were, as stated above, fully alleged by appellants in their pleadings. Also, in our opinion, there is evidence in the record which would sustain findings of fraud and mistake in regard to the 1955 Shelton deed in the event such deed is subject to the construction which the trial court has placed upon it.

■ It is our opinion that the trial court has erroneously construed the 1955 Shelton deed. We have quoted the relevant portions of this deed infra.

The language of the conveyance is remarkably clear in granting the right of ingress and egress "over the lands of grantor that lie between the property" of his neighbors to the one foot strips which were conveyed in fee to the grantees.

This right of ingress and egress was not limited to a roadway 30 feet wide as the trial court has decreed. It was an unrestricted right to use the entire 160 feet by 420 feet for these purposes.

Knox v. Pioneer Natural Gas Company, 321 S.W.2d 596, Tex.Civ.App., El Paso, writ ref. n. r. e., quotes the following from Lone Star Gas Co. v. Childress, 187 S.W.2d 936, Tex.Civ.App., Waco, n. w. h.:

" * * * 'Since the deeds do not confine the defendant's use to a strip of land thirty feet wide it is elementary that the court could not re-define the terms of the grant and restrict the use granted by the instruments * * *'

absent fraud, accident or mistake."

■ If we are wrong in this construction of the deed, then the construction put upon it by the parties to it by their conduct is admissible to evidence the intention of the parties to the deed and their understanding of its terms. Henshaw v. Texas Natural Resources Foundation, 147 Tex. 436, 216 S.W.2d 566.

There is evidence in the record that the grantees have used this property without restriction for many years for access to the water, swimming, parking cars and for other purposes for which parks are generally used.

Also the record reflects that the grantor in this deed, Emmett Shelton, conveyed his interest in the property without receiving anything in return for it. This is consistent with the construction of the deed as leaving Mr. Shelton with only the naked legal title to the property.

Mr. Shelton is quoted as saying to Dr. Forister in 1965 that he gave Lots 1 and 2 to the Bee Creek Club to "all you owners as it was always intended to be" and that he had nothing further to do with it.

■ We are also of the opinion that the words "water front privileges" as used

in the 1955 Shelton deed should be construed in the light of the circumstances surrounding the execution of such deed in order that the real intention of the parties to it may be ascertained. Guardian Trust Co. v. Bauereisen, 132 Tex. 396, 121 S.W.2d 579. If there is any reasonable doubt as to what this term means, then a question of fact is presented for determination. Trinity Universal Insurance Co. v. Ponsford Brothers, 414 S.W.2d 16, Tex.Civ.App. El Paso (March 1967), Easements, Sec. 14, p. 133, Vol. 21, Tex.Jur.2d.

■ We overrule appellees' contention that the rights which appellants seek to establish in the property in suit are precluded by the rule against perpetuities. We are dealing with vested interests. See 70 C.J.S. Perpetuities, § 10, p. 584.

Appellees also contend that they are bona fide purchasers as to any rights which appellants seek to establish in the property other than under the 1955 Shelton deed.

■ The three elements of a bona fide purchase are good faith, a valuable consideration, and absence of notice. 92 C.J.S. Vendor and Purchaser § 321.

We are of the opinion that these elements are not established as a matter of law.

In November 1964, before appellees acquired any interest in this property Mr. Holloway wrote Mrs. Elba May Shelton, former wife of Emmett Shelton, from which we quote:

"Bill Coleman, Emmett, Jr., and I, almost two years ago, formed a non-profit corporation, Bee Creek Club, Inc. It was our purpose to obtain title to this land, subject to the easements and rights of the fifteen people mentioned and to organize a club, giving each of them a right of membership. We had in mind that all of us could co-operate to improve the property and make the waterfront more usable to all of us.

Shortly thereafter, in January, 1963, Emmett gave a deed to the property to this Club, without consideration. It was his attitude that he had no interest in the property except to make it usable for the people holding waterfront rights.

\*   \*   \*   \*   \*   \*

I would not attempt to advise you what the property is worth. Burdened with the rights of the waterfront owners and lacking any waterfront, the land is not worth even approximately what it would be without this handicap. Since the rights of all concerned are somewhat uncertain and ambiguous, anyone who bought the property might be buying controversy and litigation. If you want to sell it, rather than donate it, I would consider that in fairness Emmett, Sr., should be paid an equal amount. The situation should be clarified, however, one way or the other, as you nor anyone else will derive any substantial benefit from the property in the present condition of the title."

We have quoted, supra, from the affidavit of Dr. Forister concerning a conversation with appellees in which Mr. Coleman stated that it was necessary to get all the property owners together in order to build anything on the property.

■ We will not search the record for other evidence to establish that a fact issue was presented negating appellees' plea of bona fide purchase for the reason that the burden was on appellees to establish this plea by proof. Vendor and Purchaser, 59 Tex.Jur.2d, Sec. 810. We find no conclusive evidence in the record that appellees bought this property without notice of the claims of appellants and those similarly situated to easements appurtenant by estoppel.

■ Appellees have a counterpoint to the effect that since appellants also moved for a summary judgment that the trial court could not find that material fact issues were present but must determine the rights

of the parties in the land in suit as a matter of law. Appellees cite no authorities to support this strange theory. The contrary is held in Tigner v. First National Bank of Angleton, 153 Tex. 69, 264 S.W.2d 85, and followed in Pleasant v. Johnson, 367 S.W.2d 173, Tex.Civ.App. Beaumont, writ ref. n. r. e. The counterpoint is overruled.

 Summarizing, we hold (a) that issues of fact are presented as to the establishment of an easement appurtenant by estoppel for park and related purposes on the property in suit (b) that fact issues are or may be presented as to the meaning of the words "waterfront privileges" as used in the 1955 deed (c) that, as a matter of law, the 1955 deed gives to the grantees therein an unrestricted right to use all of the property in suit for ingress and egress to the waterfront.

We do not foreclose the trial of other issues, such as bona fide purchase, which may be raised by pleadings and evidence.

This brings us to the question of whether our judgment of reversal and remand should inure to the benefit of nonappealing plaintiffs in the court below. We believe that it should. In Hamilton and Co. v. Prescott, 73 Tex. 565, 11 S.W. 548, Justice Gaines, for the Court, held that "* * * a judgment against two or more parties which is appealed from by one may be reversed as a whole, according to the manifest justice of the case * * *."

We believe that manifest justice requires the judgment entered by the trial court in this case be set aside in its entirety. See Appeal and Error—Civil, 4 Tex.Jur.2d Secs. 875–6, p. 462, Vol. 4, McDonald Texas Civil Practice, p. 1476.

The judgment of the trial court is reversed and this cause is remanded for trial in accordance with this opinion.

Reversed and remanded.